**STATE of Missouri, Respondent,**

v.

**Mark Anthony BROWN, Appellant.**

No. 13158.

Missouri Court of Appeals,
Southern District,
Division Three.

Feb. 3, 1984.

Motion for Rehearing and to Transfer Denied Feb. 24, 1984.

---

Jimmie D. Stokley, Asst. Public Defender, Kennett, for appellant.

John Ashcroft, Atty. Gen., Sandra K. Stratton, Bruce Farmer, Asst. Attys. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant, charged in Count I with the capital murder of Janet Sue Johnson, a 27-year-old female, and in Count II with the capital murder of Janet's 7-year-old daughter, Sabrina Leigh Johnson, waived trial by jury, Rule 27.01(b),[1] and, upon trial by the court, was found guilty of murder in the second degree, § 565.004, RSMo 1978, under Count I, and guilty of capital murder, § 565.001, RSMo 1978, under Count II. The court sentenced appellant to imprisonment for life under Count I, § 565.008.2, RSMo 1978, and to imprisonment for life without eligibility for probation or parole until he had served a minimum of 50 years of his sentence under Count II, § 565.008.1, RSMo 1978. The sentences were ordered to run concurrently.

Appellant says the court erred in (1) receiving in evidence appellant's oral and written confessions and "real evidence," because the investigating officers failed to comply with Miranda v. Arizona,[2] (2) receiving in evidence statements made by appellant and "physical evidence" obtained from him, because he was not promptly brought before a judge as required by Rule 22.07(a), and (3) failing to find him not guilty by reason of mental disease or defect excluding responsibility.

In determining the sufficiency of the evidence to support the trial court's findings on the issue of guilt or innocence, we accept as true all evidence tending to prove appellant's guilt, together with inferences favorable to the State that can be reasonably drawn therefrom, and we disregard all contrary evidence and inferences. State v. Giffin, 640 S.W.2d 128, 130[2] (Mo. 1982). If there is substantial evidence to support the trial court's findings, its judgment is to be affirmed. Id. at 130[1].

The evidence on the issue of guilt or innocence is intertwined with the evidence pertaining to the admissibility of the items about which appellant complains. Appellant filed a pretrial motion to suppress those items, and the trial court held an evidentiary hearing and made findings of fact. Our review of the trial court's ruling on the motion to suppress is limited to a determination of whether the evidence is sufficient to sustain its findings. State v. Baskerville, 616 S.W.2d 839, 843[2] (Mo. 1981). In making our determination, we are mindful that the weight of the evidence and credibility of witnesses are questions for the trial court's resolution. State v. Boggs, 634 S.W.2d 447, 453[4] (Mo. banc 1982).

Viewed in accordance with Griffin, Baskerville and Boggs, the evidence supports the following findings.

On Monday, June 1, 1981, the Malden Police Department received a report of a fire (evidently unrelated to this case) behind an equipment company along the Cotton Belt Railroad tracks. Captain William R. Earnheart went to that location about

---

1. Rule references are to Missouri Rules of Criminal Procedure (13th ed. 1982).

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6:35 p.m., and saw appellant sitting on the tracks.

The two approached each other and Earnheart saw appellant "had some blood on him, and cuts." Earnheart asked what appellant's problem was, and appellant explained he had "some girl friend trouble" and needed to be alone and think. Earnheart asked appellant if he would like to go to the police station for first aid, but appellant declined.

Earnheart radioed the dispatcher, instructing him to notify the Railroad of appellant's presence on the tracks, and to ask whether the Railroad wanted appellant removed.

Earnheart, suspecting appellant "was attempting suicide, just waiting for a train," told a nearby officer to keep an eye on appellant. Earnheart's suspicion was based on appellant's refusal of medical attention and Earnheart's impression from appellant's actions that "something was very wrong."

Earnheart then departed, going to the restaurant where appellant was employed. There, Earnheart learned appellant had been scheduled for work the night before, but had failed to report. The restaurant manager gave Earnheart the address of the apartment where appellant lived, and Earnheart went there, finding it locked. He "hammered on the door, trying to rouse somebody," but got no answer.

Meanwhile, the dispatcher had notified the Railroad that appellant was on the tracks, and the Railroad had requested that appellant be removed. The dispatcher advised Earnheart of this by radio. Earnheart, believing appellant was outside the Malden city limits, instructed the dispatcher to request a deputy sheriff to remove appellant.

The dispatcher radioed Dunklin County Deputy Sheriff Vernon George Earnheart (Captain Earnheart's brother), and advised Deputy Earnheart of Captain Earnheart's request.

Deputy Earnheart, who knew appellant, went to the scene and observed appellant sitting on the tracks. Deputy Earnheart saw appellant was cut on the wrist and cheek. Appellant explained to Deputy Earnheart that he and his girl friend had a fight, and he had tried to kill himself.

Deputy Earnheart asked appellant to go to the city hall for medical attention, and appellant agreed. En route, Deputy Earnheart, observing that appellant was "disturbed," told appellant that if there was anything he (Earnheart) could do to help, he would be glad to try. Deputy Earnheart also told appellant that if he wanted to talk, he (Earnheart) would be glad to listen. At some point, appellant told Deputy Earnheart he had cut himself with a knife.

A medical technician was summoned to city hall, and the technician dressed appellant's wounds in a room adjoining the dispatcher's office. The technician, observing that appellant "seemed to be worried," asked appellant how he had received the wounds. Appellant explained he had fallen through a plate glass table. The technician replied that the wounds could not have been obtained that way.

Deputy Earnheart then told appellant that he (Earnheart) had to leave. At that point, appellant asked to speak to Earnheart alone. The technician departed, advising appellant and Earnheart that appellant's arm wounds needed stitching by a doctor.

Deputy Earnheart "cleared the room," and suggested to appellant that they move farther from the dispatcher's office. Appellant walked across the room, seated himself, began crying, and said, "I killed her."

Deputy Earnheart said, "Who?"

Appellant said, "Janet," adding, "I loved her, but I killed her and put her in the closet."

According to Deputy Earnheart, he "couldn't believe it." Earnheart's first thought was that if appellant had done what he said, perhaps Janet was not dead, but only hurt. Earnheart asked appellant if he (Earnheart) "could go see."

Appellant took the apartment key from his pocket, handing it to Earnheart. Earnheart told the dispatcher and other officers what appellant had said, cautioning them to say nothing to appellant and not to let appellant go anywhere until he (Earnheart) returned.

Deputy Earnheart, Captain Earnheart and other officers then went to the apartment, entered, and found Janet dead in a closet and Sabrina dead in the front room.

The Earnhearts returned to city hall and Captain Earnheart arrested appellant at 8:12 p.m. Captain Earnheart advised appellant of his rights as required by *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and asked appellant if he understood them. Appellant answered, "Yes." Captain Earnheart then asked appellant if he wished to talk, and appellant again answered, "Yes."

Appellant then wrote a brief statement in his own hand admitting that on May 31 he killed Janet with an ax and strangled Sabrina at the apartment. This statement was witnessed by Captain Earnheart and the dispatcher at 8:28 p.m.

Meanwhile, Malden Police Chief Bob McDonald, having been radioed by the dispatcher, had gone to the apartment at 8:15 p.m. Thereafter, Corporal Jerry Crismon of the Missouri Highway Patrol, who had been contacted by phone, went to the apartment to "process" it. The sheriff and the coroner of Dunklin County were there when Crismon arrived. Crismon entered the apartment, made photographs, and collected "items of evidence."

At 8:50 p.m., Chief McDonald, who had returned to city hall, advised appellant of his rights per *Miranda* and asked whether appellant understood them and whether appellant wished to talk, receiving affirmative replies to both questions. McDonald, Deputy Earnheart and Captain Earnheart then questioned appellant, the conversation being recorded on tape.

Appellant (born September 5, 1962) explained that he began living with Janet and Sabrina in October, 1977. He described his relationship with Janet as a "common law marriage." Appellant related that on Sunday, May 31, while Janet was doing exercises on the apartment floor, he "just went crazy" and hit her in the back of the head with an ax he had borrowed earlier that day. She ran toward a door and he struck her in the head with the ax a second time. She fell and he put her in a bedroom closet.

Appellant added that Sabrina was gone when this occurred. When Sabrina returned, appellant told Sabrina that Janet was gone with friends, then put his hands around Sabrina's neck and strangled her.

Appellant revealed that after strangling Sabrina, he "sexually assaulted her" in the vagina. Appellant recounted that he thereafter took a razor and cut his arm and knee "to try to get myself to bleed to death." He remained in the apartment during the night of May 31 and the following day, "recutting" his wounds several times. He left the apartment between 5:00 and 6:00 p.m., June 1.

The taped interview during which these disclosures were made was of 10-minutes' duration. After that interview, appellant was taken to a hospital for further treatment of his wounds.

The next day, June 2, the prosecuting attorney filed a complaint in Division 2 of the Circuit Court of Dunklin County, accusing appellant of both murders, and a warrant for appellant's arrest was issued and served on him. However, appellant was not taken to court that day, as more fully appears, *infra*.

Corporal Crismon went to the Dunklin County jail about 3:30 p.m., June 2, and advised appellant of his rights per *Miranda*. With appellant's permission Crismon took appellant's shirt and undershorts, and samples of appellant's head hair and pubic hair. Crismon also obtained appellant's written consent to reenter the apartment. Thereafter, Crismon returned to the apartment and removed some additional items.

The following day, June 3, the investigator for the Dunklin County prosecuting attorney took appellant from the jail to the

jury room, and, in the company of Crismon and another officer, advised appellant of his rights per *Miranda*. After ascertaining that appellant understood those rights, the investigator asked appellant if he wished to talk, and appellant said, "Yes, I do." The investigator thereupon questioned appellant about the events of May 31 and June 1.

During the questioning, appellant said that when he accompanied Deputy Earnheart to city hall for medical attention, he knew he was not under arrest. Appellant added that he realized Deputy Earnheart was not trying to question him. Describing the circumstances of his statement to Deputy Earnheart, appellant said:

A. He asked me—no he didn't ask me anything, I just told him that I had killed my wife and he asked me—he just told me that he thought that she might not be dead, you know. He asked me if I had keys to the apartment and I did and I gave it to him.

Q. Okay. So you voluntarily told him that?

A. Yeah.

Q. Okay. And you voluntarily gave him the keys to the apartment?

A. Yeah.

Q. He wasn't trying to question you or interrogate you or anything at that time?

A. No.

Appellant also stated that he had understood his rights when he was questioned by Captain Earnheart on June 1 after the bodies were discovered, and when he was questioned later that evening by Chief McDonald, Deputy Earnheart and Captain Earnheart. Appellant added that what he told them was voluntary.

Appellant then revealed additional details of the slaying of Janet and Sabrina, including the fact that he had struck Janet with the ax more than twice, that he was not sure where he hit her, and that before he strangled Sabrina he had tacked towels over the windows so people would not be able to see in after dark. Appellant also disclosed that he had indeed decided to "go up to the tracks and jump in front of the train" on June 1.

The June 3 interrogation of appellant by the prosecuting attorney's investigator was recorded on video tape.

Appellant was first brought before a judge June 5, 1981. At that appearance, appellant was found indigent and two attorneys were appointed to represent him.

Appellant based his pretrial motion to suppress on the ground that his first incriminatory statement to Deputy Earnheart, just after his wounds were dressed at city hall, was obtained in violation of *Miranda*, in that he was in custody and had not been advised of his rights as *Miranda* requires. All subsequent statements and physical evidence were, according to appellant, "fruit of the poisonous tree."

At the hearing on the motion to suppress, the trial court heard testimony from Captain Earnheart, Deputy Earnheart, Chief McDonald, Sergeant Crismon, the prosecuting attorney's investigator, the medical technician and the dispatcher. That testimony was as heretofore summarized, and was uncontradicted, inasmuch as appellant did not testify at that hearing.

Appellant did, however, call the prosecuting attorney as a witness at the suppression hearing. The prosecutor explained that "Court days" in Division 2 of the Circuit Court of Dunklin County are normally Tuesday and Friday, and that prisoners are brought to Court only on those days. Prisoners' appearances are scheduled by the Court, not the prosecutor, and the prosecutor has no practice of trying to produce prisoners in Division 2 on any other day. The prosecutor stated he would have made himself available on Tuesday, June 2, 1981, had the judge of Division 2 ordered that appellant be brought to Court that day.

It was stipulated that June 2, 3 and 4, 1981, were not holidays, and the Dunklin County Courthouse was open for business on those days.

At the suppression hearing, appellant did not assign the delay in initially bringing him to court as a ground for excluding any evidence. Instead, appellant relied on *Miranda* to exclude his first incriminatory statement, and on the "poisonous tree doctrine" to exclude all subsequent statements and the physical evidence seized as a result of the first statement.

The trial court found that appellant's first incriminatory statement to Deputy Earnheart just after appellant's wounds were dressed was voluntary, and was not made as a result of any interrogation, and that appellant was not then in custody, was not being restrained, and was not under suspicion of having committed a homicide or any other crime. The court found that all of the other statements to which we have referred were made by appellant after his constitutional rights had been read and explained to him, and after he understood those rights. The court further found that the evidence recovered from the apartment by Crismon on June 1 and 2, and the items taken by Crismon from appellant at the jail on June 2, were obtained with the full consent of appellant. The court further found that all of appellant's statements were made voluntarily, without threats, coercion or promises, that appellant's consent to search was made without threats, coercion or promises, and that in each and every instance appellant understood the nature and consequences of his statement or consent. The trial court ruled that the evidence appellant sought to suppress was "not subject to being suppressed under and pursuant to the Motion filed by defendant."

At the start of trial (almost five months after the ruling on the motion to suppress), appellant's attorney asked that the motion to suppress be considered a continuing objection to the evidence to which it was directed. He also announced he objected to that evidence "on the grounds that under Rule 22.07 [3] there was a dely (sic) in bringing the defendant before a Magistrate, in that the record will show that the arrest or detention was obtained on Monday, and he was not brought before a Magistrate or Division II Judge until Friday of that same week." Defense counsel [4] did not explain how that delay affected admissibility.

Neither side offered further evidence on the suppression issue, and the trial court stated its rulings would remain the same.

Trial then commenced. The thrust of the defense appears in this excerpt from defense counsel's opening statement:

> This case is being tried to Your Honor because the defendant and his attorneys are not trying to deny that in this case a very horrible crime has taken place, nor do we deny that this defendant committed these horrible acts, so horrible, in fact, we feel his mental state has to be looked into. It's obvious such an occurrence would not take place by a person with premeditation in a normal mental state. Therefore, Your Honor, what we intend to present to you today is evidence that is relevant to a very precise legal and medical definition of what is not guilty by reason of mental disease or defect.

Counsel then explained he would present evidence regarding appellant's family background and upbringing, and testimony of a psychiatrist who examined appellant before trial.

During the State's case, all of appellant's incriminatory statements to which we have referred were received in evidence. Medical testimony established that the cause of Janet's death was disruption of the heart as a result of a blow to the chest. Medical findings as to Sabrina were consistent with her death being caused by suffocation or

---

**3.** Rule 22.07(a) provides, in pertinent part: "A person arrested under a warrant for any felony shall, as soon as practicable, be brought before a judge of the court from which the warrant was issued."

**4.** Appellant's counsel on appeal did not represent appellant at trial.

strangulation. Medical testimony further established, to a reasonable degree of medical certainty, that some object had been inserted into Sabrina's vagina causing abrasions, and such condition was consistent with intercourse.

Crismon identified 13 photographs he took on June 1. Twelve were taken in the apartment; the other was a photograph of Janet's body after it was removed to a hospital. All were received in evidence.

The State also introduced into evidence various items removed from the apartment by Crismon, including knives, a sheet, pillow cases, an ax, and numerous other things. From the record before us, we are unable to identify the items that were removed from the apartment on June 1, and those that were removed on June 2.

Additionally, the clothing and hair Crismon had obtained from appellant on June 2 were received in evidence.

Laboratory tests by a "forensic scientist and criminalist" revealed blood similar to Janet's on the ax and appellant's shirt, and blood similar to Sabrina's on the sheet. Blood similar to appellant's was found on one of the knives.[5]

High acid phosphatase activity characteristic of seminal fluid was found on a pillow case and the sheet. Similarly high acid phosphatase activity was found on swabs from Sabrina's vagina. Loose hair from Sabrina's pubic area was found to have no microscopic difference from appellant's pubic hair.

Appellant did not testify at trial; however, his attorney presented the evidence regarding appellant's mental condition that had been outlined in opening statement. The State presented rebuttal evidence on the mental disease issue. Both sides' evidence on that issue will be summarized after we consider appellant's first two points.

■ Appellant begins his argument under point 1 with the assertion that his right under U.S. Const. amends. IV and XIV to be secure against unreasonable seizure of his person was violated when he was taken from the tracks to city hall. Appellant argues that his first incriminatory statement to Deputy Earnheart was obtained by exploitation of this unlawful restraint, and was thus inadmissible under *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

In our view, *Dunaway* does not aid appellant. In *Dunaway*, a suspect was picked up by police for the purpose of being questioned about certain known, but unsolved, crimes. The police lacked probable cause for the suspect's arrest. After compliance with *Miranda*, the suspect was questioned, and he eventually made incriminatory statements. *Dunaway* held that the suspect's fourth amendment right against unreasonable seizure of his person was violated and that the burden was on the prosecution to show that the incriminatory statements were not obtained by exploitation of the illegal restraint. Factors relevant to that determination include the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Dunaway*, 442 U.S. at 218, 99 S.Ct. at 2259.

Here, the trial court found that appellant was not in custody when he made the first incriminatory statement to Deputy Earnheart, that appellant was not being restrained, and was not under suspicion of having committed a homicide or any other crime.

Appellant argues he was under restraint because Deputy Earnheart admitted he would have taken appellant from the tracks to city hall on June 1 even if appellant had not agreed to go. There is no evidence, however, that appellant was told he had to

---

5. Before trial, the State, by court order, was allowed to obtain a sample of appellant's blood. Appellant was represented by counsel at that time. The order provided that the sample be taken at a hospital. No issue is raised about this.

accompany Deputy Earnheart. Indeed, a short time earlier, appellant had refused Captain Earnheart's invitation to go to city hall for first aid, and had been allowed to remain on the tracks. The circumspect quality of the officers' conduct is demonstrated by Captain Earnheart's testimony that he did not remove appellant from the tracks at that time because, "I didn't want to upset him more than what he already was until I was sure what I was doing." Deputy Earnheart, explaining why he would have taken appellant to city hall even without appellant's consent, said, "I couldn't let him go, he couldn't go, he wasn't able to go."

It is evident that here, unlike *Dunaway*, the purpose of taking appellant to city hall was for medical attention, as shown by the summoning of the technician to dress appellant's wounds. It is apparent that appellant was not taken there for questioning, as no questioning occurred and there was no known crime to question appellant about. Moreover, there is no evidence that after arriving at city hall appellant ever expressed a desire to leave, or that he was denied permission to do so. Indeed, appellant told the prosecuting attorney's investigator on June 3 that the purpose of going to city hall was to have his arm "checked out," and he knew he was not under arrest.

We hold the trial court's finding that appellant was not in custody or otherwise restrained is supported by substantial evidence.

However, even if the taking of appellant to city hall had constituted unlawful restraint, his first incriminatory statement to Deputy Earnheart would not have been rendered inadmissible, inasmuch as neither Deputy Earnheart nor any other officer exploited the situation. After appellant's wounds were dressed, Deputy Earnheart, who had asked appellant no questions, was preparing to depart when appellant asked to speak to him alone. Neither this request, nor the incriminatory statement that followed, was in response to any question. In such circumstances, neither *Dunaway*, nor its predecessor, *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), applies. *State v. Olds*, 569 S.W.2d 745, 747–48[2] (Mo. banc 1978).

■ Appellant next argues under point 1 that he should have been advised of his rights per *Miranda* before his first incriminatory statement to Deputy Earnheart. Citing *State v. Lay*, 427 S.W.2d 394 (Mo. 1968), appellant contends Deputy Earnheart should have given the *Miranda* warning when appellant asked to speak to him alone.

In *Lay*, a man was stabbed to death and his companion gave investigating officers a description of the purported assailant. The companion accompanied the officers to headquarters to aid them in identifying the culprit. During the next several hours, sundry suspects were picked up and brought in for the companion to view. Eventually, the companion told an officer that his fingerprints were on the knife that inflicted the fatal wound. The officer took the companion to his captain and advised the captain of what the companion had said. The captain, suspecting for the first time that the companion was the assailant, advised the companion per *Miranda*, and the companion thereafter admitted the stabbing.

We find nothing in *Lay* to aid appellant. When the companion said his fingerprints were on the murder weapon, suspicion immediately focused on him, and the captain anticipated a confession after learning what the companion had said. In the instant case, Deputy Earnheart was not investigating any crime and did not expect that appellant would admit any crime when appellant manifested the desire to speak.

Captain Earnheart's inquiries at appellant's place of employment and his efforts to contact someone at appellant's apartment do not establish that he suspected appellant of a crime at that time, but are instead consistent with the purpose of obtaining information to better enable the authorities to deal with a troubled and potentially suicidal citizen.

In our view, appellant's *Miranda* argument is ruled by *State v. Greathouse*, 627 S.W.2d 592 (Mo.1982). There, an investigation was under way regarding a missing man. A nephew, who lived with the missing man, told two deputy sheriffs that the man had left with a woman several days earlier. The nephew agreed to accompany the deputies to the sheriff's office to phone those details to the Highway Patrol for broadcast over Patrol radio. At the sheriff's office, after some delay, one of the deputies told the nephew he would like to know where they could find the missing man because the woman "could have killed him or something." The deputy further explained that the man's friends and neighbors were worried because the nephew had said the man was expected to return before then. The nephew began crying and admitted he had shot and killed the missing man. Thereafter, the nephew was advised per *Miranda* and made additional incriminatory statements.

Our Supreme Court held the nephew's first incriminatory statement was not a product of custodial interrogation and no *Miranda* warning was required. Noting that *Miranda* warnings are required only in circumstances of custodial interrogation, the Supreme Court held that custodial interrogation does not exist where the person questioned is not in custody because he is not even a suspect in the crime, or, even assuming that he is a suspect, when he is not under arrest or otherwise restrained of his liberty. *Greathouse*, 627 S.W.2d at 594[1].

If no *Miranda* warning was required in *Greathouse*, where the investigation concerning the missing man was in progress and the nephew was being questioned regarding the man's whereabouts, clearly no *Miranda* warning was required in appellant's case where no one was known to be missing and appellant was not being questioned.

We hold the trial court properly received appellant's first incriminatory statement in evidence.

As to his subsequent statements, appellant does not assert any noncompliance with *Miranda*, nor does he contend that he misunderstood his rights or that he did not voluntarily consent to undergo questioning in absence of counsel. His contention, as we understand it, is simply that if the first statement is inadmissible, all subsequent statements and physical evidence discovered as a result of the first statement must be suppressed. Having found the first statement admissible, we reject appellant's contention in point 1 regarding the subsequent statements. *Greathouse*, 627 S.W.2d at 595.

As to the photographs taken by Crismon at the apartment on June 1, and the items removed from the apartment that date, we find the evidence sufficient to support the trial court's finding that appellant voluntarily consented thereto. Accordingly, the trial court did not err in receiving such items in evidence. *State v. Berry*, 526 S.W.2d 92, 98[8] (Mo.App.1975). Moreover, even without appellant's consent the officers' entry into the apartment on June 1 after learning of appellant's attack on Janet would have been permissible under *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978), in that there was a possibility that Janet was still alive and her life could be saved. When the officers went to the apartment, they did not know what time the attack on Janet had occurred. Appellant had come to their attention only about an hour or so earlier, and it was possible the attack had occurred shortly before then. Under *Epperson*, the evidence obtained from the apartment on June 1 was admissible irrespective of appellant's consent. *Id.* at 265–68[6, 7].

We will consider the admissibility of the items Crismon obtained from appellant at the jail on June 2, and Crismon's seizure of additional items in the apartment that date, in ruling appellant's point 2.

Point 2 states:

The trial court erred in allowing into evidence oral, written and videotaped statements as well as physical evidence obtained from the appellant because the

requirements of Missouri Supreme Court Rule 22.07 were violated in that appellant was not promptly brought before a magistrate to have counsel assigned and be arraigned.

Inasmuch as point 2 does not identify any specific incriminatory statement, or any particular item of evidence, we assume appellant means that all incriminatory statements made by him and all items of evidence obtained from him should have been suppressed.

Evaluating this contention has proven difficult because the point does not explain how or why the delay rendered the statements and physical evidence inadmissible, and the argument thereunder, though earnest and lengthy, is somewhat obscure.

In an effort to assess the merit, if any, in point 2, we shall state the gist of appellant's argument as we perceive it. Appellant asserts that (a) his first incriminatory statement to Deputy Earnheart was inadmissible for the reasons assigned in point 1, (b) his subsequent incriminatory statements on June 1 were "tainted" by the first statement, and therefore also inadmissible, and (c) the taint was compounded by the delay in bringing him before a judge after the warrant was issued on June 2.

Appellant argues that he was kept away from a judge because the State needed a good video tape confession to buttress the illegally obtained ones. He says the efforts of the police to prevent him from receiving appointed counsel should be considered police misconduct, and "should not be condoned by this court." Characterizing the delay as an assault on the integrity of Missouri's system of criminal justice, appellant maintains his conviction should not be allowed to stand.

In considering this, we note that the only incriminatory statement introduced by the State that was obtained from appellant after the complaint was filed on June 2 was the video tape statement taken from appellant by the prosecuting attorney's investigator on June 3. All of the other statements introduced by the State were made by appellant on the night of June 1, within three hours after he was first seen on the tracks.

■ Appellant cites no case to support his contention that the delay in bringing him before a judge after the warrant was issued on June 2 destroyed the admissibility of the statements he made June 1. We know of no such rule. Accordingly, we find no merit in point 2 insofar as the June 1 statements are concerned, and we limit our attention to the June 3 statement.

■ Appellant acknowledges the holding in *State v. Smith*, 588 S.W.2d 27, 31[2] (Mo.App.1979), that failure to bring a person arrested under a warrant before a judge as soon as practicable does not automatically render involuntary a confession obtained during the delay. Whether such a confession is voluntary depends on the totality of the circumstances, and failure to produce the prisoner before the judge as soon as practicable is a factor to be considered in determining whether there has been physical or psychological coercion. *Id.* at 31[3].

In *Smith*, a video taped confession was obtained from the defendant after five days' detention without being taken before a judge. In upholding admissibility, the Court of Appeals noted, among other things, that there was no evidence of actual or threatened physical violence or deprivation of food or sleep, and no persistent or prolonged interrogation.

■ In the instant case, the video tape statement was obtained from appellant the day after the warrant was issued, and less than 48 hours after appellant was first seen on the tracks. Appellant does not contend he was subjected to physical or psychological coercion, prolonged interrogation, promises, inducements, or deprivation of food, sleep or medical care. Appellant asserts, however, that the totality of the circumstances shows an attempt to overbear and coerce him into incriminating himself.

This contention is contrary to the trial court's findings. As previously noted, the trial court found that all of appellant's incriminatory statements were made voluntarily, without threats, coercion or promises. There is sufficient evidence to sustain that finding, and that is the extent of our inquiry. *Baskerville*, 616 S.W.2d at 843[2]. Accordingly, we reject appellant's contention that the video tape statement of June 3 was involuntary.

We have previously noted that appellant does not contend that he failed to understand his right to counsel at the June 3 interrogation, nor does he argue that he did not knowingly and voluntarily waive his right to counsel at that time. Additionally, no contention is made that the June 3 interrogation offended appellant's right to counsel under U.S. Const. amend. VI and Mo. Const. art I, § 18(a). *See Boggs*, 634 S.W.2d 447, where a defendant was interrogated without counsel after the filing of a felony complaint, and the evidence was found sufficient to support a finding that he knowingly, intelligently and voluntarily waived his right to counsel at that interrogation.

As we understand appellant's argument, his only attack on the June 3 statement in point 2 is that it was involuntary. Having upheld the trial court's finding against appellant on that issue, we reject point 2 as to the June 3 statement.

Appellant does not explain why the clothing and hair samples obtained from him by Crismon on June 2 should have been suppressed, so we assume he intends the same argument about those items that he made about the June 3 statement. As already observed, the trial court found those issues against appellant. We hold the evidence sufficient to sustain the trial court's findings regarding those items. Accordingly, the court did not err in admitting them in evidence.

We do not understand point 2 to raise any issue about Crismon's seizure of the items (whatever they were) from the apartment on June 2. However, even if such issue were raised, it would be unavailing in view of the trial court's finding that appellant consented to the apartment search that date. Moreover, we have earlier noted the failure of the record to show which items were removed that date. Consequently, we would be unable to review any allegation of error pertaining thereto. *State v. Miles*, 364 S.W.2d 532, 536[7] (Mo.1963).

Point 2 is denied.

In point 3, appellant argues that the trial court erred in failing to find him not guilty by reason of mental disease or defect excluding responsibility because the nature of the crime demonstrated a diseased or defective mind and the medical testimony was either substantially in support of mental disease or defect, or was partly in favor thereof and partly ambiguous.

Appellant was examined twice by Dr. Robert R. Knowles, a psychiatrist of his choice. The first examination was December 3, 1981, and the second was January 20, 1982. Each lasted between one and a half and two hours.

Dr. Knowles testified that in his opinion, appellant had "passed into a state of dissociation, an altered state of consciousness," at the time the offenses occurred. According to Dr. Knowles, appellant "falls within the not guilty by reason of insanity rule." Dr. Knowles explained that appellant, as a result of his mental state at the time of the offenses, did not know and appreciate the nature, quality and wrongfulness of his alleged conduct. This opinion was based in part on the circumstances of appellant's upbringing, characterized by Dr. Knowles as "very unsatisfactory."

Appellant was born out of wedlock. His father never showed any interest in him. During the first 11 years of appellant's life, his mother was married and divorced twice. One of her husbands was an alcoholic, and neither husband took any interest in appellant. Between the first and second mar-

riages, appellant and his mother lived with appellant's maternal grandmother. By the time appellant was 14, his mother had taken a third husband. At that time, appellant moved in with his maternal grandmother, remaining there until he began living with Janet and Sabrina.

Dr. Henry R. Bratkowski, a staff psychiatrist at Fulton State Hospital, examined appellant July 22, 1981, and concluded that he was not suffering from mental disease or defect at that time. Dr. Bratkowski was also of the opinion, to a reasonable medical certainty, that on May 31, 1981, appellant could appreciate the nature and quality of his acts. However, Dr. Bratkowski was unable to form an opinion as to whether, at the time of the killings, appellant could conform his conduct to the requirements of the law.

Dr. Parwatikar, a consultant to the staff at Fulton State Hospital, conducted a "sodium amytal interview" with appellant July 22, 1981. Dr. Parwatikar concluded that at the time of the killings, appellant was unable to conform his conduct to the requirements of the law.

Appellant argues that he sustained the burden of proof imposed by § 552.030.7, RSMo 1978, as amended by Laws 1980, p. 518. Appellant asserts he introduced substantial evidence that he was suffering from a mental disease or defect excluding responsibility at the time of the killings, and that this evidence was not rebutted by the State.

Section 552.030.7 provides, in pertinent part:

> All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct.... The issue of whether any person had a mental disease or defect excluding responsibility for his conduct is one for the jury to decide upon the introduction of substantial evidence of lack of such responsibility.... Upon the introduction of substantial evidence of lack of such responsi-

bility, the presumption shall not disappear and shall alone be sufficient to take that issue to the jury.

The statutory presumption that all persons are free of mental disease or defect excluding responsibility for their conduct has been held sufficient, alone, to sustain the rejection of the defense of not guilty by reason of mental disease or defect excluding responsibility by a jury, *State v. Ginnery,* 617 S.W.2d 117, 120[3] (Mo.App. 1981), and by a judge, *State v. West,* 575 S.W.2d 257, 258 (Mo.App.1978).

Here, the trial court, as the trier of fact, was not required to accept and follow the opinions of Dr. Knowles and Dr. Parwatikar. *State v. King,* 526 S.W.2d 58, 59[4] (Mo.App.1975). The credibility of witnesses and the weight of their testimony were within the decisional domain of the trial court, and are not subject to review on appeal. *West,* 575 S.W.2d at 258. The statutory presumption that appellant was free of mental disease or defect excluding responsibility, which remained in the case throughout, was alone sufficient to support the trial court's findings. *King,* 526 S.W.2d at 59[4]. Consequently, whether Dr. Bratkowski's testimony was, in appellant's words, "partly ambiguous," is immaterial.

Point 3 is denied.

Judgment affirmed.

GREENE, C.J., and FLANIGAN, MAUS and PREWITT, JJ., concur.