**STATE of Missouri, Respondent,**

v.

**Vernon Charles JALO, Appellant.**

**Vernon Charles JALO, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 15789, 16750.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 19, 1990.

Janet M. Thompson, Columbia, for appellant.

William L. Webster, Atty. Gen., Martin D. Kerckhoff, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant Vernon Charles Jalo was charged with the class B felony of conspiracy, § 564.016, RSMo 1986, to commit kidnapping and murder. He waived trial by jury, was tried by the court, found guilty as charged, and sentenced as a prior and persistent offender, § 558.016.2 and .3, RSMo 1986, to 20 years' imprisonment. He brings appeal 15789 from that judgment and sentence.

Following the conviction, appellant commenced a proceeding under Rule 29.15 [1] to vacate the conviction. An evidentiary hearing produced a judgment denying relief. Appellant brings appeal 16750 from that judgment.

The appeals are consolidated, Rule 29.-15($l$), but addressed separately.

### Appeal 15789

Appellant's first point relied on asserts the evidence was insufficient to support the finding of guilty in that neither appellant nor his alleged coconspirator, Chris Miller, "ever did an overt act in furtherance of the

---

**1.** Rule references are to Missouri Rules of Criminal Procedure (19th ed. 1988).

alleged conspiracy so as to elevate their actions beyond mere talk."

The trial court's finding of guilty has the force and effect of a jury verdict. Rule 27.01(b); *State v. Giffin*, 640 S.W.2d 128, 130[1] (Mo.1982); *State v. Ingleright*, 782 S.W.2d 147, 149[1] (Mo.App.1990). In determining the sufficiency of the evidence to support the finding of guilty we accept as true all evidence tending to prove appellant's guilt, together with inferences favorable to the State that can be reasonably drawn therefrom, and we disregard all contrary evidence and inferences. *Giffin*, 640 S.W.2d at 130[2]; *State v. Brown*, 665 S.W.2d 945, 948[1] (Mo.App.1984). If there is substantial evidence to support the trial court's finding, its judgment must be affirmed. *Giffin*, 640 S.W.2d at 130[1]; *Brown*, 665 S.W.2d at 948[2].

Viewed favorably to the result below, the evidence reveals that some time prior to January 15, 1988—the precise date is not shown—appellant[2] told James Steddum,[3] a high school student, that he (appellant) wanted Steddum to put him in contact with a young "hoodlum." Appellant cautioned Steddum not to tell appellant's wife or daughter. Steddum told appellant about Chris Miller, a 15–year–old high school student.

Appellant and Miller met for the first time January 15, 1988, about 3:30 p.m., at Hardee's, across the street from Neosho High School. Appellant told Miller he (appellant) had an idea "that could bring in approximately five million dollars."

Appellant inquired whether Miller could obtain "some false I.D.s, and a .38 snubnosed police special." Appellant expressed preference for an FBI or marshal's badge. Miller responded he had a brother-in-law in jail "because he had been forging I.D.s."

Appellant told Miller "somebody might be killed, die." Appellant asked Miller "to try and find somebody who could possibly help assist, preferably a young lady." Miller gave appellant the name Christina Devore, Miller's 14–year–old stepsister.

Appellant asked whether Miller was interested in the plan. Miller replied, "Yes." The conversation ended when Miller had to depart for work.

Appellant and Miller met again four days later (January 19, 1988), about 3:30 p.m., at the same site. Appellant showed Miller "some blueprints for a fully automatic weapon," together with publications[4] containing formulas for explosives and information about "an I.D. printer." Asked whether appellant said anything about his background, Miller testified, "He stated that he had been in and out of institutions since he was 14, and that he had had this idea in his head for approximately 5 years, and he knew what he was doing."

Appellant asked Miller when they would contact his stepsister. Miller replied, "Well, right now."

The duo left Hardee's, picked up appellant's daughter at high school, and, with appellant driving, took her to "71 Truck Stop" in Diamond, northeast of Neosho, where she was employed. From there, appellant and Miller drove to Joplin to see Christina.

Miller entered Christina's residence and escorted her outside to the car. Appellant asked her whether "she was interested in making a lot of money pretty fast." She said yes. Appellant told her Miller had said she "would do just about anything for money," and asked whether that was true. She said yes, adding that she was "pretty crazy."

Appellant asked Christina whether she "could pull a trigger on anybody, or if she

---

2. Appellant's age is not established by the evidence. However, in his opening statement, appellant's lawyer characterized appellant as "a lonely old man of the age of 54." On cross-examination by the prosecutor, appellant admitted being "convicted as a juvenile" in 1950. It is thus inferable that appellant was 53 or 54 at the time of the events in question.

3. At trial (May 20, 1988), Steddum testified he was 18 and engaged to appellant's daughter.

4. Appellant testified one of the publications was the "Anarchist's Cookbook," an "underground book" containing "recipes" for LSD and explosives, along with techniques for growing marihuana.

could find any other people, some girls that might be willing to go along with it." As he posed the question, appellant "made the motion of pulling the trigger." Christina said yes. Appellant then stated he "would probably be the one to have to, if that came down to that situation." Appellant added that he "was a conniving son-of-a-bitch." Appellant and Miller then departed, returning to Neosho where they stopped at Wendy's.

While they were conversing inside, appellant wrote "kidnap" on a paper napkin, showed it to Miller, and said, "This is what we're going to do." Appellant then pulled the napkin back and wrote "$25,000" on it. Miller asked who would be kidnapped. Appellant mentioned the name T.W.,[5] stating she "had been pampered by her parents all her life" and they "would be more than willing to pay $25,000 to get her back."

Miller, when asked at trial whether appellant explained the method for the kidnapping, testified:

"He said that this is what the badge FBI or marshall [sic] would be used for, that he would go up to this person and flip it out and say, 'I need to speak to you, and would you please come with me?'

Q. Did he indicate how this $25,000 was to be applied?

A. He was going to kidnap these people, and then on that same day call their parents and tell them that if they wanted their daughter back, or son, then they would have to pay $25,000 and bring it to 'X' spot."

The duo left Wendy's and appellant drove them to Loma Linda, described by appellant as "an estate which has ... 2 golf courses, and quite a large number of fine homes." Appellant had once worked there as a security guard.

En route, appellant said there were three other girls who could be "easily accessible" to the plan. Appellant stated they attended school at Seneca, were cheerleaders, and one was a dentist's daughter. Appellant told Miller he (appellant) "wanted to point

out the route that they took, and how easily it would be to get them." Miller's trial testimony included this:

"Q. ... Did the [appellant] make any statement as to what would happen to these victims after the kidnapping?

A. He stated that no matter what, they would die, and then their bodies would be thrown down a mine shaft of some sort, and would not be found, unless by accident.

....

Q. Did he indicate why he was going to kill the victims?

A. So that he could not be identified.

Q. Did you happen to discuss any hostage locations?

A. Yes, sir.

Q. And what did you say?

A. I gave him a reference to a house, an abandoned house.

Q. And did you indicate where this abandoned house was?

A. By James Steddum's house."

Upon arriving at Loma Linda, appellant pointed to a street and told Miller the dentist's daughter lived there. Appellant showed Miller another area and said one of the girls lived there.

The pair then returned to Neosho. Asked whether appellant said anything before they separated, Miller testified, "He stated that I could tell Christina of the plan, but no one else; that otherwise, he would do away with me, kill me."

Appellant and Miller met again around 4:30 p.m., January 20 or 21, 1988, at Neosho High School. Appellant asked Miller whether he "was in or not." Miller answered, "Yes." Appellant then asked Miller to arrange another meeting with Christina. Miller told appellant they could meet the evening of January 26, 1988.

Miller informed James Steddum of the abduction scheme and asked whether Steddum thought he (Miller) should report it to law enforcement officials.

On January 22, 1988, Miller, accompanied by Steddum, went to the Newton County

---

**5.** We use initials, there being no need to identify the young woman by name in this opinion.

Courthouse and told Detective Pat Stewart of the Neosho Police Department and Bob Williams, the investigator for the Newton County Prosecuting Attorney, about the plan, including "the solicitation of guns and identification." Detective Stewart asked Detective Lance Nichols of the Joplin Police Department to assist in the investigation, as Nichols does "a lot of undercover work."

On January 25, 1988, Nichols went to appellant's home. Nichols was wearing a concealed "bodymike"; its transmissions were being monitored and recorded by Detective Stewart, Investigator Williams and an FBI agent.

Nichols, using an assumed name, told appellant, "Chris ... said to pay you a visit, you may need ... somethin'." Appellant asked what Nichols had and what he could get. Nichols replied that it depended on what appellant needed and that Chris had said appellant "may need some guns."

Appellant stated, "Yea, we might need a few ... I.D. wouldn't hurt a ... bit." Nichols said he could handle military police I.D. Appellant responded that he had been trying to get such identification.

Nichols then asked what kind of guns appellant wanted. Appellant replied, "Oh, I need nothing smaller than a 32."

Nichols and appellant discussed handguns, after which appellant asked whether Chris knew how to get in touch with Nichols. Nichols answered, "Yea ... he can get a hold of me, I'm in and out." Nichols added that if appellant wanted "a little extra man power," he (Nichols) was game "for about anything."

Appellant stated, "I got something in the back of my head ... the chance for some big bucks, that somebody has not tried, has not been tried, that's all I'll say."

Nichols then departed.

About two hours later Nichols returned to appellant's residence carrying "a briefcase full of handguns, and a sawed-off shotgun." Appellant and Nichols discussed some of the handguns, and appellant picked one up "to look at it more closely." Nichols offered to allow appel-

lant to keep one of the guns for a week and shoot it. Appellant declined, but added, "[We're] definitely interested." Nichols then identified himself as a police officer and arrested appellant.

Appellant argues in his first point that the State, in its haste to arrest him, acted prematurely before he "took any substantial step or overt act in furtherance of the alleged conspiracy."

Section 564.016, RSMo 1986, provides:

"1. A person is guilty of conspiracy with another person or persons to commit an offense if, with the purpose of promoting or facilitating its commission he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such offense.

. . . .

4. No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

. . . ."

 The essence of the crime of conspiracy is an agreement to commit a crime. *State v. Fetty,* 654 S.W.2d 150, 153[4] (Mo. App.1983). Before a conviction for conspiracy may be obtained, proof must be adduced that an overt act in furtherance of the conspiracy was committed. *State v. Ray,* 768 S.W.2d 119, 121 (Mo.App.1988). However, there is no requirement that such act be a physical one. *Id.* at 121[2]; *State v. Mace,* 682 S.W.2d 163, 166[2] (Mo.App. 1984). There is likewise no requirement that such act be a substantial step in the commission of the target offense. *State v. Neal,* 685 S.W.2d 271, 273[3] (Mo.App. 1985).

 In the instant case there was evidence of the following overt acts by appellant in pursuance of the conspiracy. (1) Appellant, at his second meeting with Chris Miller, brought blueprints for an automatic weapon and some published information about a printer capable of creating false identification. (2) Appellant drove himself

and Miller from Neosho (by way of Diamond) to the residence of Christina Devore in Joplin where appellant asked her whether she was interested in making money fast and whether she "could pull a trigger on anybody." (3) Appellant drove himself and Miller from Neosho to Loma Linda where appellant showed Miller the street on which the dentist's daughter resided and the area where another potential victim lived. (4) Appellant, having initially asked Miller about obtaining a .38 caliber pistol, picked up and examined one of the handguns shown him by Nichols.

The above acts are more than sufficient to fulfill the "overt act" requirement for a conspiracy conviction. Appellant's contention to the contrary is meritless.

Appellant also argues that Chris Miller's testimony "is so lacking in probative force as to not constitute substantial evidence."

■ A conspiracy conviction may be had on the uncorroborated evidence of an accomplice unless such testimony is so lacking in probative force as not to amount to substantial evidence. *State v. Moore*, 642 S.W.2d 917, 924[5] (Mo.App.1982).

■ Miller's testimony was corroborated in many respects by appellant's own testimony. Appellant admitted meeting Miller on all three occasions about which Miller testified. Appellant also admitted (a) driving himself and Miller to Joplin for the meeting with Christina Devore, (b) writing "kidnapping" and $20,000 or $25,000 on the paper napkin, (c) naming T.W. in response to Miller's question about who would be kidnapped, and (d) driving himself and Miller to Loma Linda where appellant showed Miller different people's homes.

Credibility of the witnesses in this judge-tried case was for the trial judge to determine. *State v. Styles*, 476 S.W.2d 591, 592[3] (Mo.1972); *State v. Freeman*, 777 S.W.2d 324, 325 (Mo.App.1989). The trial judge, at the conclusion of the case, stated he believed the testimony of Miller and

Nichols, together with the recordings of Nichols' two conversations with appellant.

We hold that Miller's testimony, considered in conjunction with the other evidence favorable to the State, is not so lacking in probative force that it fails to amount to substantial evidence. Appellant's first point is denied.

Appellant's brief presents five other points pertinent to appeal 15789.[6] Unlike the first point, which was drafted by counsel, the other five are presented pro se. All five violate the "wherein and why" requirement of Rule 30.06(d), and consist mainly of conclusional averments and abstract statements of law. We have nonetheless examined them and have detected no merit.

Point II, as we fathom it, complains that appellant was not afforded a preliminary hearing. The record on appeal does not contain the docket sheet from Division II of the Circuit Court of Newton County, the division in which a preliminary hearing would have either been held or waived. The only docket sheet in the record begins with the date February 17, 1988, when the transcript and file from Division II was received by Division I.

■ In order for an appellate court to review an alleged trial court error, the appealing party must see to it that the record on appeal incorporates the basis for the alleged error. *State v. Jones*, 594 S.W.2d 932, 935[5] (Mo.1980); *State v. Greathouse*, 694 S.W.2d 903, 909–10[12] (Mo.App.1985). As the record does not substantiate appellant's claim that he was denied a preliminary hearing, appellant has failed to meet his burden of demonstrating error. Moreover, appellant proceeded to trial without objecting that he had been afforded no preliminary hearing, thereby waiving any right to complain about the matter. *State v. Ashe*, 403 S.W.2d 589, 591[3] (Mo.1966). Finally, it appears from Miller's trial testimony that a preliminary hearing was indeed held, as Miller was asked on cross-examination about testimony he had given at

---

6. Appellant's brief contains points designated "I" through "VII." One of them (point V) asserts appellant received ineffective assistance from

the lawyer who represented him at trial. That point therefore pertains to appeal 16750.

the preliminary hearing "back in February." Additionally, in answer to the State's pretrial request for disclosure, defendant's lawyer referred to "a copy of the preliminary hearing transcript" prepared by the lawyer's secretary.

Point III alleges appellant's conviction was obtained by an unlawful search and seizure by police officers. The record does not show that anything was taken from appellant when he was arrested or afterward. More importantly, even if something was seized, the record clearly shows that nothing obtained from appellant or his premises was offered in evidence at trial.

Point IV, as we comprehend it, complains that Miller was granted "immunity from prosecution" in exchange for his testimony at the preliminary hearing [7] and trial, and that the State concealed this fact. Appellant directs us to no evidence supporting this allegation. Miller was presented as a witness by appellant at the evidentiary hearing in the 29.15 proceeding. The prosecutor's cross-examination of Miller included this:

"Q. Mr. Miller, you never asked for any special consideration in return for your testimony; is that correct? You never asked the State for any special consideration for your testimony at trial?

A. No.

Q. And isn't it further true that ... I asked you just to testify in a truthful manner and just tell the Court what happened?

A. Yes, sir.

Q. And is that what you did?

A. Yes, sir."

We find no evidence refuting the above testimony.

■ Point VI complains that statements taken from appellant shortly after his arrest were involuntary for sundry reasons. Appellant does not explain how this supplies a basis for reversal. During the State's case-in-chief the prosecutor presented no statement made by appellant after his arrest. The only reference we find to

any such statement is in the prosecutor's cross-examination of appellant, where this colloquy occurred:

"Q. ... isn't it also true that you told officers that you didn't care if these people were male or female?

A. I do not recall that statement.

Q. You don't recall when being asked whether or not you wanted to meet these people for sexual reasons, you said, 'Not necessarily.'

And he said, 'Male or female?'

And you said, 'It doesn't matter, I'm bisexual.' You don't recall making that statement to Officer Stewart?

A. I recall making that statement to Officer Stewart."

The above testimony was received without objection, hence no complaint about its admission is preserved for review. *State v. Gardner*, 741 S.W.2d 1, 3[1] (Mo. banc 1987), *cert. denied*, 486 U.S. 1025, 108 S.Ct. 2001, 100 L.Ed.2d 232 (1988).

■ Point VII appears to argue that appellant was entrapped (inferentially by Miller). An accused is entrapped only if a law enforcement officer or an agent acting for the police induces the accused to engage in criminal conduct when he was not ready and willing to engage in such conduct. *State v. King*, 708 S.W.2d 364, 367[1] (Mo.App.1986). In the instant case all of appellant's discussions with Miller about the abduction scheme occurred before Miller disclosed the plan to the police. There was no evidence that Miller was in league with any law enforcement agency during his conversations with appellant. No entrapment occurred.

Appellant has shown no basis for reversal in appeal 15789.

## Appeal 16750

■ Point V, the only one not yet discussed, and the only one pertinent to appeal 16750, proclaims that the circuit court clearly erred when it determined that the lawyer who represented appellant at trial

---

7. This averment obviously contradicts appellant's complaint in point II that he was not

afforded a preliminary hearing.

("defense counsel") provided effective assistance. Appellant maintains defense counsel rendered ineffective assistance in failing to (1) suppress an "illegally coerced confession used at trial by the State," (2) move for sanctions against the State when it did not "reveal all discovery it intended to use at [trial] to defense counsel," and (3) call witnesses at trial as requested by appellant.

In denying post-conviction relief, the circuit court made extensive findings of fact and conclusions of law. Those pertinent to point V are:

"... the State did not introduce movant's confession at trial.... [It] was used only for impeachment purposes. The Court further finds that no prejudice was shown by movant in the limited use of same. The Court further finds that the confession ... was legally obtained and was not subject to being suppressed....

... The Court finds that the State did not withhold evidence from the movant and disclosed the evidence that it possessed. Further, that the movant has failed to show what sanctions would have been appropriate by any non-disclosure which the Court determines has not occurred. That if movant in his motion alludes to non-disclosure of any records upon which the movant was found to be a prior and persistent offender, counsel was granted full opportunity to review same at and during the course of trial and properly and vigorously objected to their use and introduction.

....

... movant and [defense] counsel discussed possible witnesses for the defense and which witnesses to call or not call as a matter of trial strategy.

... [The] witnesses complained of by movant as not testifying were present at the trial and could have testified if so called but were not called as a matter of trial strategy."

The circuit court further found that the testimony of two persons who were not called as witnesses would have been cumulative and would not likely have affected the outcome of the trial, and that the testimony of a third would not have benefited appellant in that it would have been adverse to his position.

The circuit court concluded that defense counsel demonstrated the care and skill of a reasonably competent attorney under the existing circumstances, and that appellant was not denied effective assistance of counsel.

■ Our review of the judgment denying post-conviction relief is limited to a determination of whether the findings and conclusions of the circuit court are clearly erroneous. Rule 29.15(j); *Amrine v. State*, 785 S.W.2d 531, 533[2] (Mo. banc 1990).

We have determined that the circuit court's denial of post-conviction relief is based on findings of fact that are not clearly erroneous, that no error of law appears, and that an extended opinion in appeal 16750 would have no precedential value. The judgment in the 29.15 proceeding is therefore affirmed in compliance with Rule 84.16(b)(2).

\* \* \*

In appeal 15789 appellant's conviction of conspiracy and 20–year prison sentence is affirmed. In appeal 16750 the judgment denying post-conviction relief is affirmed.

MAUS, P.J., and PREWITT, J., concur.