**STATE of Missouri, Respondent,**

v.

**Mark Everett PIPPENGER, Appellant.**

**No. 13664.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 10, 1986.

Motion for Rehearing or Transfer Denied
April 4, 1986.

Application to Transfer Denied
May 13, 1986.

Ronald A. Conway, Asst. Public Defender, Springfield, for appellant.

William L. Webster, Atty. Gen., Christine M. Szaj, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Mark Everett Pippenger ("defendant") guilty of forcible rape, § 566.030.1, RSMo Cum.Supp.1980, and assessed punishment at 20 years' imprisonment. Judgment was correspondingly entered and defendant appeals, relying on five assignments of error. Four are presented in a brief filed by appointed counsel; the other is asserted in a pro se brief.

Inasmuch as one of the assignments of error briefed by counsel (point 3) is that the evidence was insufficient to support the verdict, a synopsis of the evidence is necessary. In determining whether the evidence was sufficient to support the verdict, we view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences to be drawn from the evidence, and we ignore contrary evidence and inferences. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied,* — U.S. —, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald,* 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied,* — U.S. —, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985).

So viewed, the evidence establishes that on Tuesday, March 29, 1983, M____ S_____ ("complainant"), an unmarried female, was residing alone in an apartment in Springfield. She locked her outside door and went to bed about 10:00 p.m., clad in "sweat pants and a pull over sweat shirt and socks."

About 2:00 a.m., complainant awoke and saw a man standing over her bed. Light from floodlights outside was shining in through a sliding glass door beside the bed, enabling complainant to observe that the intruder was about six feet tall, stockily built, with full hair, a full face, and deep set eyes.

Complainant, fearful for her life, asked the intruder who he was. He replied, "Just be quiet."

The intruder then got on top of complainant, turned her over on her stomach, and taped her eyes and mouth closed with duct tape. He then taped her arms behind her back.

Complainant was trying to talk, so the intruder untaped her mouth and complainant asked whether the intruder wanted money. He replied, "No, I'm here for you." He then replaced the tape over complainant's mouth and said, "I'm not going to hurt you, well, maybe your pride."

The intruder then removed all of complainant's clothing and, with complainant face down on the bed, tied each of complainant's arms separately to a bedpost with rope, and tied each of her legs separately to the bottom of the bed.

Complainant, who was scared and shaking, heard the intruder remove his clothes, and she felt his fingers placing lubricant in her vagina. The intruder then had sexual intercourse with complainant.

The intruder thereafter obtained a washcloth from the bathroom and washed complainant and the sheets. He then dressed, untied complainant, removed the tape from her eyes and mouth, and placed a pillow over her head, warning her to close her eyes and make no sound.

The intruder thereupon unplugged complainant's telephone and departed.

Complainant remained motionless until she was sure the intruder was gone. Then, she plugged her phone back in and telephoned her mother about what had occurred, asking her mother to call the police. Complainant then telephoned a female friend, who rushed to complainant's apartment. Police officers arrived soon afterward.

Complainant was taken to a hospital for examination, and later to police headquarters where a composite drawing was made of the intruder.

On April 14, 1983, 15 days after complainant was raped, Detective Don Pippin of the Springfield Police Department arrested defendant. Interrogation of defendant by Pippin produced a lengthy written statement, signed by defendant, and ultimately received in evidence over defendant's objection at trial. The admission of this statement in evidence is the subject of defendant's point number 1, and the circumstances of defendant's interrogation by Pippin will be detailed when we address that point.

In his statement to Pippin, defendant, age 32, revealed that in December, 1982, and January, 1983, he had lived in an apartment at the same apartment complex as complainant's apartment. While residing there, defendant had made a key which he believed would unlock all apartments in the complex. He used that key to enter complainant's apartment shortly before 2:00 a.m., March 30, 1983. Defendant knew complainant lived in that apartment, having seen her on prior occasions. He did not, however, know her name.

In his statement, defendant admitted in detail the acts described by complainant, disclosing that he had brought rope, tape, and Vaseline with him when he entered complainant's apartment. Without reciting the particulars of defendant's statement, it is sufficient to say that it closely parallels complainant's version of the incident, and establishes with absolute certainty that defendant was the intruder.

After learning about the key with which defendant had gained entry to complainant's apartment, Detective Pippin asked defendant if he still had it. Defendant informed Pippin that the key was in a room where defendant had been staying in Nixa. Defendant signed a "search waiver" and prepared a note to the owner of the Nixa residence authorizing Pippin to obtain the key.

Pippin thereafter went to the residence, obtained the key, and went to complainant's apartment. There, Pippin inserted the key in the lock and observed that it unlocked complainant's door.

The preliminary hearing was held May 20, 1983, not quite two months after complainant was raped. During that interval, complainant had been shown no photographs of suspects and had viewed no lineups. At the preliminary hearing, defendant was seated at the back of the courtroom with three other males whose physical characteristics were similar to defend-

ant's. Complainant identified defendant on that occasion as the man who had raped her.

At trial, January 19, 1984, complainant again positively identified defendant as the culprit.

In contending that the evidence was insufficient to support the verdict, defendant does not dispute that complainant was raped. Instead, he impugns complainant's identification of him as the assailant. Specifically, defendant points out that (a) complainant conceded at trial that the composite drawing did not look exactly like her attacker, (b) complainant testified that her attacker had no mustache, while two acquaintances of defendant testified he had a mustache in March, 1983, and (c) complainant testified that her attacker had smooth hands, but defendant was a construction worker and an acquaintance testified that defendant's hands were scarred and that he once had a gash on an index finger. Additionally, defendant reminds us that no hairs consistent with his were found on complainant's clothing or bed linens.

■ Defendant's arguments supply no basis for disturbing the verdict. As to the composite drawing, complainant testified she was not satisfied with it at the time it was prepared, and that she told the officer who prepared it that it did not look like the man who raped her. As to defendant's alleged mustache and rough hands, it is sufficient to note that the jury was not required to believe the witnesses who furnished that testimony, as the credibility of the witnesses and the weight of their testimony were for the jury to determine, the jury being free to believe all, some, or none of the testimony of any witness when considered with the facts, circumstances and other testimony in the case. *State v. Jackson*, 608 S.W.2d 420, 421[1] (Mo.1980); *State v. McMikle*, 673 S.W.2d 791, 795–96[3] (Mo.App.1984). As to the absence of hairs consistent with defendant's on complainant's clothing and bed linens, a criminalist with the Springfield Police Department crime laboratory testified that he had received only two head hairs and two pubic

hairs from defendant, and that it is preferable to have a minimum of 15 or 20 for comparison purposes "[b]ecause hair will vary on an individual."

■ Defendant cites *State v. Phillips*, 585 S.W.2d 517, 520[1] (Mo.App.1979), for the proposition that when the testimony of the prosecutrix in a rape case is contradictory and in conflict with physical facts, surrounding circumstances, and common experience so as to be so unconvincing and improbable that it is extremely doubtful, corroboration of such testimony is required to sustain a verdict of guilty. That proposition, while correct as an abstract statement of law, has no application here. As already noted, defendant does not question the fact that complainant was raped. What he is saying, as we understand it, is that complainant's identification of him as the perpetrator was, for the reasons he enumerated, "contradictory and in conflict with physical facts." Having found no merit in any of the particulars relied on by defendant, we reject his assertion that complainant's testimony was contradictory and at odds with the physical facts. Consequently, we find *Phillips* inapposite.

■ The testimony of a single witness, if believed by the jury beyond a reasonable doubt, is sufficient to establish the identity of the culprit in a criminal prosecution, *State v. Tucker*, 451 S.W.2d 91, 95[5] (Mo. 1970), and to support a conviction, *State v. Dowe*, 432 S.W.2d 272, 274–75[3] (Mo.1968). Moreover, complainant's identification of defendant as her assailant was corroborated by defendant's statement to Pippin which positively established that defendant was the rapist, and by defendant's possession of the key capable of unlocking complainant's apartment door. In view of the compelling evidence of defendant's guilt, his contention that the evidence was insufficient to support the verdict is ludicrous.

We now address defendant's point number 1, which reads:

"The trial court erred in admitting defendant's statement into evidence in that the statement was not voluntary because

it was induced by a promise and made while defendant was in a depressed state of mind."

Prior to trial, defendant filed a motion to suppress the statement he made to Detective Pippin on the date of his arrest. The motion alleged, among other things, that the statement was involuntary in that it was induced by promises made by Pippin to defendant "of leniency, to talk to the Judge on behalf of the Defendant, to guarantee that the Defendant would not be returned to Indianna [sic] for prosecution."

The trial court conducted an evidentiary hearing on the suppression motion several weeks before trial. Detective Pippin, testifying at that hearing by deposition, explained that at the outset of the interrogation, he advised defendant of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As defendant raises no issue about compliance with *Miranda*, we need not synopsize Pippin's testimony on that subject.

Pertinent to defendant's point 1, Pippin testified:

"Q ... During your conversations with [defendant] did you ever promise him that you would obtain any type of psychiatric help for him if he made a statement?

A The statement was made. I didn't promise him that is what would happen. I promised him that that would be the only way he could get it. If he thought he needed help, the court system is how he should probably obtain this.

Q So that you mean if he needed help— would you expand on that? What did you tell him?

A Basically the fact was when we was going into this case and it appeared that he was going to tell me about the case, he also asked prior to telling me about it that I make another promise to him. It wasn't a promise that had anything to do with the case. It was in reference to his family having knowledge that he had been arrested for rape. And I told him at that time that I would not notify his family that he had been, you know, arrested for rape or even charged with rape. Basically the same thing as this.

We talked about his mental state in this thing. He advised that he was having problems, and I told him the only way he could get his problem taken care of, you know, was to come clean on this thing and get it taken care of by the court, that maybe they could help him.

Q And didn't you, in fact, advise him that you would assist him in that regard?

A I did. I put it in the case synopsis, what he said. I told him I would. I believe it is listed in there, the statement that he made.

Q Did you tell him that you'd talk to the prosecuting attorney and explain the situation to him?

A To the prosecutor that handled the case.

Q And did you also tell him that you'd explain it to the judge, if necessary?

A I don't recall making any statement about explaining it to the judge.

Q Do you remember promising him that you would discuss it with his attorney and work with him?

A Yes, I did say I would talk to his attorney when he had an attorney.

.    .    .    .    .

Q Did you ever indicate to him that you thought that he would probably receive some type of a probation out of the case?

A No. The only thing I may have indicated to him was the fact that if he did want help and he thought he needed help, that the court system was how he was to get it. As far as what would happen to him, that was up to him. I told him at that time it was up to him and his attorney. And it was up to his attorney to try to provide, you know, whatever he could for him, not me.

.    .    .    .    .

His demeanor at the time I talked with Mark was very—was that of very depressed. When I told you earlier that I was against bond being set for him, which I was, was due to the fact of the state of mind that he was in at that time.

Q Were you aware of any charges that might have been pending against him in Indiana at the time that you took this statement from him?

A There was—I'm not sure when that occurred. I did make a contact with Indiana in regards to his past record. There was one—I think I did inquire in regards to possible sexual offenses that he might have been involved in. Only one came back; that was a window-peeping incident. I don't recall how long before this, but he was fined, and I think there was a ten-day suspended sentence or something like that.

Q Didn't you agree that you could guarantee to him that he wouldn't be returned to Indiana on any charges if he would cooperate with you here?

A No. I didn't say that, no.

Q What did you say, do you remember?

A I don't recall the exact things. He was worried about having to go back to Indiana on this thing here. I told him that as long as it was in our jurisdiction that we had first, you know—first claim to him on this particular incident. Anything that he might have done, of course, he would have had to, you know, go back to some other date, but I didn't guarantee him that.

Q Did he ever express to you a concern about going back to Indiana?

A Yeah, he seemed concerned about having to go back there. That was probably the reason I checked his record. I never did quite understand what his reasoning was for not wanting to go back or for not wanting his family to know about this, other than the embarrassment of it.

Q Did you advise Mark that you could keep him out of Indiana if he executed this statement?

A No. I had no reason to promise Mark that, you know. I really wasn't concerned what he was—what he could have done in Indiana. I was concerned about the case at hand. The only promise I made Mark about Indiana—I stated earlier the fact that he was very concerned about his parents and, apparently, daughter knowing what he was charged with, and the only promise I made him was that I would not personally contact them myself. I think during that I even advised him that, you know, although I would not do that, that was no sign that somebody during the course of this proceeding would not make contact with his parents.

Q And did you promise him that in exchange for him making this statement?

A Did what now?

Q Did you promise him that in exchange for this statement?

A No. No. It was just something that seemed to be bothering him, and I just tried to relieve his mind, you know, that there was no need—no need for me to call Indiana and tell his parents or his daughter that he had been arrested here, you know. He's an adult, and there's no need for me to make contact.

. . . . .

I never assured him [that he would receive some type of psychiatric assistance.] I told him that that was the only way he could get any help, that my main job was to prosecute him, you know, was to see that he was prosecuted. If he wanted help that he should ask for it, and the only way that he could get it was if he'd contact an attorney and get his attorney to get it for him. I think I did tell him that I had no qualms with that. Obviously in talking to Mark, in my opinion, you know—I'm not a psychiatrist, but Mark was very deeply depressed."

Defendant, testifying at the suppression hearing, quoted Pippin as saying that he did not believe the incident was serious, that he did not think complainant had been raped, and that he did not expect her to appear in court. Defendant testified he feared he had been arrested for return to Indiana to face a "felonious assault" charge. According to defendant, Pippin stated that if he (defendant) cooperated so that Pippin could "get the case off the books," Pippin would keep defendant from going to Indiana, and would not notify defendant's family that defendant had been involved in the instant case. Defendant added that Pippin stated they "could possibly bring in a doctor that would back him up as far as keeping me here."

Additionally, said defendant, Pippin promised that he would tell defendant's attorney what the situation was, that he would contact a bail bondsman and get defendant back on the street, and that he would even speak to the judge and explain what defendant had done, and why. Furthermore, said defendant, Pippin stated that the most that would happen to defendant would be a year's probation.

Defendant testified that he made the statement and signed it in exchange for Pippin's promises.

Three days after the suppression hearing, the trial court entered this order: "Deft's Motion to Suppress, overruled."

At trial, Detective Pippin, testifying before the jury, explained that when he told defendant, during the interrogation, that he (Pippin) felt defendant was responsible for the rape at the apartment complex, defendant dropped his head, began crying, and asked, "If I tell you about it can you make me a promise?"

Pippin testified he answered defendant thusly:

"I told him that I couldn't promise him anything, but I would have to know what it was that he wanted and his request was that if I would not let his family know in Indiana.

I advised him at that point that I could promise him that I would not personally let anyone in his family know that he had been arrested or what he had been charged with.

Q. And, did he agree to talk with you at that time?

A. Yes.

Q. Now, did you promise him any type of leniency on the charge or charges that might be brought?

A. No."

On cross-examination, Pippin was asked whether he made any promises to defendant. Pippin answered:

"Yes. I think I advised earlier that at one point he did ask me at the time he more or less related to me a confession, that he was going to tell me about it if I would promise him that I would not notify his family in Indiana. Which, I did state to him that I could promise him that I would not do that and did not, in fact, do that.

Q. And, that's the only promise you made to him?

A. Yes.

Well, I did, well, I did say one other thing during the conversation. I think I said, at one point when he was advised of an attorney, somewhere in there, which would have been you, if that attorney had contacted me I would have talked with him in regards to Mark's mental state with depression that he was in at that time.

.    .    .    .    .

Q. And, you also promised him that you would not notify his family that he had been arrested or even charged with rape, that was a promise you made to him, wasn't it?

A. Yes, that was a promise that I made him."

Defendant did not testify at trial. However, defendant's brother, Chester, testified that their mother, an Indiana resident, had twice undergone surgery, had been hospitalized six weeks for stress, and had been taking "minor tranquilizers" for ten years. Chester explained that he had not informed

her that defendant was being tried in Missouri for rape because he did not want to elevate her stress.

The assignment of error in defendant's point number 1 was preserved by objection when his written statement was received in evidence at trial, and was reasserted in his motion for new trial. The objection, as articulated in the argument under point 1, is that the statement was involuntary in that it was induced by promises to defendant by Pippin that (a) Pippin would not notify defendant's family of defendant's arrest or prosecution, and (b) Pippin would talk to defendant's attorney about defendant's "mental status." Defendant maintains he did not want his family to know of his involvement because of his mother's poor health.

When this appeal was submitted for our determination, we noted that the record did not show with unmistakable clarity that the trial court had found that defendant's written statement to Pippin was voluntarily made as required by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967). Without express findings upon which the trial court had denied defendant's motion to suppress, it was evident that we could not properly decide defendant's point 1.

Consequently, in accordance with *State v. Glenn*, 429 S.W.2d 225, 237–38[29, 30] (Mo. banc 1968), and *State v. Auger*, 434 S.W.2d 1, 6–7[9] (Mo.1968), we issued an order to the trial court to make express findings as to whether defendant's statement was or was not voluntary. The findings were to be made after giving counsel and defendant notice and an opportunity to present arguments on that issue. No evidence except that already in the record was to be considered by the trial court in making its findings.

The trial court, in compliance with our order, made findings of fact and conclusions of law, including, *inter alia*, the following:

"1. That in order for a confession to be deemed inadmissible on the grounds of a direct or implied promise, the promise to the accused must be positive in its terms and clear in its implications. *State v. Urhahn*, 621 S.W.2d 928, 932 (Mo. App., E.D.1981);

2. That in assessing the impact of an alleged promise on an obtained confession, the test is 'whether or not the defendant's will was overborne to such a degree by the law enforcement officers that the defendant was deprived of a free choice to admit, deny or to refuse to answer questions.' *State v. Urhahn, id.* at 932;

3. That in view of these principles, it is clear that the pivotal issue is whether Detective Pippin's assurance that he personally would not let defendant's family know of the arrest (Tr. 197) and Detective Pippin's statement regarding obtaining psychiatric help (Tr. 231–2) actually induced defendant into giving his confession;

4. That in the instant case, the record provides no evidence that defendant was induced by Detective Pippin's statements or actions to give his statement.

*Decision*

In view of the foregoing, it is the decision of this court that the record contains no evidence that Detective Pippin's conduct during interrogation was such that it overbore appellant's free choice to admit, deny or to refuse to answer his questions. Accordingly, it is this Court's decision that defendant's statement was given freely and voluntarily and was therefore admissible into evidence."

Our review of the trial court's ruling on defendant's motion to suppress is limited to a determination of whether the evidence is sufficient to sustain its findings. *State v. Baskerville*, 616 S.W.2d 839, 843[2] (Mo. 1981); *State v. Brown*, 665 S.W.2d 945, 948[3] (Mo.App.1984). In making that determination, we are mindful that the weight of the evidence and the credibility of the witnesses were questions for the trial court's resolution. *State v. Boggs*, 634 S.W.2d 447, 453[4] (Mo. banc 1982); *State*

*v. Hahn,* 618 S.W.2d 435, 438 (Mo.1981); *Brown,* 665 S.W.2d at 948[3].

It is clear from the trial court's findings that he disbelieved defendant's testimony at the suppression hearing. The trial court found that the only promises made to defendant by Pippin were the ones recounted by Pippin, i.e., that Pippin would not personally notify defendant's family in Indiana that defendant had been arrested for, and charged with, rape, and that Pippin would tell the prosecutor and defendant's attorney about defendant's mental state.

Defendant tacitly concedes that the trial court was not obliged to believe his version of the interrogation. Such concession is evidenced by defendant's attack on the admissibility of the statement, which attack is based solely on the two promises that the trial court found Pippin had made to defendant.

The issue presented by defendant's point number 1 thus narrows to whether Pippin's promise to defendant that Pippin would not personally notify defendant's family about defendant's involvement in the instant case, and Pippin's promise to defendant that he would inform the prosecutor and defendant's attorney about defendant's mental state, rendered defendant's written statement to Pippin involuntary, and consequently inadmissible.

The Supreme Court of Missouri had an analogous case over 100 years ago: *State v. Hopkirk,* 84 Mo. 278 (1884). There, the accused contended that his confession of a murder was inadmissible because it was induced by promises. Specifically, the evidence showed that one of the interrogators, in response to a question by the accused regarding what good it would do him to confess, replied: "The state might be easier on him." The court held that this was no promise, but at most the expression of an opinion in response to the accused's question. *Id.* at 286. The interrogator also told the accused that if he could get out on bond, he could drive a bus for the interrogator. The court held that this did not invalidate the confession, for the law is that where a confession is made under the

influence of some collateral benefit or boon, no hope or fear being held out in respect to the particular criminal charge, then such confession, though made under the influence of such collateral inducement, is receivable. *Id.*

The rule in *Hopkirk* was applied in *State v. Williamson,* 339 Mo. 1038, 99 S.W.2d 76 (1936). There, the accused was jailed and charged with murder. He was already on parole from a life sentence in Illinois for another murder. While jailed, the accused told the sheriff that he had violated his parole and would be willing to return to prison in Illinois, as he knew "a lot of the boys over there." Shortly before trial, the sheriff asked the accused if anybody had been with him when he shot the victim. The accused said no. The sheriff then asked the accused whether he was alone, and the accused answered yes. Then, the accused said, "Wait a minute, before I tell you any more, I want to know what I am going to get out of this." The sheriff replied that he would recommend to the prosecutor that the accused be sent back to Illinois. The next day, a deputy sheriff told the accused that if he would make a complete statement, he (the deputy) would recommend to the sheriff that the accused be returned to Illinois. The accused then confessed, in writing. At trial, the accused testified he confessed because of the promised recommendations for his return to the Illinois penitentiary. The court stated that in order for a confession induced by promises to be rendered inadmissible, the promises must be "promises of 'worldly advantage,' as distinguished from adjurations of a moral or spiritual nature; and they must be direct, as distinguished from collateral." 99 S.W.2d at 79[6]. The court explained that the promises "must have reference to the accused's escape from punishment, or to the mitigation of his punishment, for the crime charged, and not offer merely an opportunity for the gratification of his personal desires, or for his greater comfort, or for the granting of a benefit to some third person." *Id.* The court noted that the logic of the rule had been questioned, but

that it appeared to be in force in this state, citing *Hopkirk*. 99 S.W.2d at 79–80.

The court in *Williamson* went on to say that the promises to recommend that the accused be returned to the Illinois penitentiary would probably be only a collateral benefit, which would not invalidate the confession. 99 S.W.2d at 80. The court pointed out, however, that the accused could have reasonably inferred that if he were surrendered to Illinois authorities to serve out a life sentence there, he would not be held to answer for the murder in Missouri. Consequently, the promises were promises of immunity, rendering the confession inadmissible. *Id.*

The rationale of *Hopkirk* and *Williamson* was applied in *State v. King*, 342 Mo. 1067, 119 S.W.2d 322 (1938), another murder case. There, the accused testified that he confessed because he was beaten during the interrogation, and because the interrogators told him that if he did not confess, his lady friend "would get the same thing he did." The court held that the alleged promise that a third person—the lady friend—would be saved from getting what the accused did if he confessed was not a promise of worldly advantage such as would invalidate the confession. Furthermore, the trial court found, on the basis of testimony by the interrogators, that no such promise was made and that the accused was not mistreated. Admissibility of the confession was upheld. 119 S.W.2d at 328.

■ We find that Pippin's promise to defendant that he (Pippin) would not notify defendant's family about defendant's arrest or prosecution if defendant confessed falls squarely within the rule of *Hopkirk*, *Williamson*, and *King*. Defendant would obviously derive no benefit himself from Pippin's secrecy; the person benefited would be defendant's mother, who would be spared the worry and stress that such information would have caused. We there-

fore hold that this promise by Pippin did not invalidate defendant's confession.[1]

As to Pippin's promise that he would inform the prosecutor and defendant's attorney about defendant's mental state if defendant confessed, we note that such promise gave no indication that defendant would escape conviction or that he would benefit from any mitigation of punishment.

In *State v. Rickey*, 658 S.W.2d 951 (Mo. App.1983), a murder case, the accused asked at the outset of the interrogation whether he would receive the death penalty if he confessed. The interrogator replied, "I did not know for sure, but probably not." The accused then confessed. Before trial, he moved to suppress the confession, but the motion was denied. On appeal, it was held that the interrogator's comment could not be reasonably construed as a promise of leniency. *Id.* at 954[3]. Admissibility of the confession was upheld.

*State v. Urhahn*, 621 S.W.2d 928 (Mo. App.1981), relied on by the trial court, is similar to *Rickey*. In *Urhahn*, the accused testified that the interrogator stated "that the only way I could help myself to get out of trouble was to speak to him then." The court in *Urhahn* held that this was not a promise positive in terms and clear in implication, but instead was a mere expression of opinion. 621 S.W.2d at 932[3–5]. The accused's confession was held admissible.

In the instant case, Pippin's promise to tell the prosecutor and defendant's attorney about defendant's mental state if he confessed carried no express or implied assurance of leniency or favorable treatment. Indeed, Pippin testified that he explained to defendant that his (Pippin's) main job was to prosecute defendant, and that if defendant wanted help, he should get his attorney to ask for it. Accordingly, we reject defendant's contention that Pippin's promise that he would inform the prosecutor and defendant's attorney about defendant's

---

1. The rule that a promise of a collateral benefit will not invalidate a confession has been applied in three recent Georgia cases: *Johnson v. State*, 170 Ga.App. 71, 316 S.E.2d 160 (1984); *Patrick v. State*, 169 Ga.App. 302, 312 S.E.2d 385 (1983); and *Bragg v. State*, 162 Ga.App. 264, 291 S.E.2d 112 (1982).

mental state was a promise of leniency that rendered the confession involuntary.

In reaching that conclusion, we have not ignored the cases relied on by defendant. One of them, *State v. Chandler*, 605 S.W.2d 100 (Mo. banc 1980), involved a contention by the accused that his confession was induced by promises of leniency for himself and his brothers, along with a promise that he could be released on bond, and a promise that a friend of the interrogator would write a book about the accused's life from which the accused would earn a lot of money. The trial court, however, found that the accused's confessions were not made in reliance on promises, and the Supreme Court found the evidence sufficient to support that finding. *Id.* at 117[5].

*State v. Christian*, 604 S.W.2d 758 (Mo. App.1980), another case cited by defendant, is factually unlike the instant case. In *Christian*, the 17-year-old accused conferred with an attorney after his arrest and was advised by the attorney to make no statement. The attorney informed the sheriff's office that he had so advised the accused. Several hours later, without an attorney present, the accused was told by the sheriff that "cooperation is the best way to go," and that the sheriff would communicate the accused's cooperation to the prosecuting attorney. The accused agreed to cooperate, and a deputy sheriff was summoned to transcribe his statement. Only then was the accused given the *Miranda* warnings. The court held that questioning should not have commenced until the accused voluntarily waived his right to counsel and consented to questioning, and that the accused's inculpatory statements were therefore inadmissible. *Id.* at 763.

Defendant also relies on *State v. Deyo*, 387 S.W.2d 561 (Mo.1965), for the proposition that evidence of an accused's mental state is proper to impair or destroy a confession. In *Deyo*, however, the evidence showed that the accused had an I.Q. between 65 and 74, a "mental age" of 12, and performed on the level of a normal 10-year-old. The pivotal issue with respect to the confession in *Deyo* was whether the accused was mentally capable of making the statements contained in the confession, or whether the confession had been authored by the interrogators and merely signed by the accused. In the instant case, defendant testified that the written statement obtained from him by Detective Pippin was the statement that he (defendant) made. Nothing in the record suggests that defendant was mentally incapable of formulating any part of the statement. Indeed, defendant's statement contains expressions of regret and palliatives for his conduct. *Deyo* has no application here.

*Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), also cited by defendant, is likewise inapplicable. The issue there was whether a plea of guilty was voluntary, not whether a confession was admissible.

Having concluded that neither of Pippin's promises to defendant rendered defendant's confession inadmissible, we deny defendant's point 1.

Defendant's point 2 states:

"The trial court erred in failing to exclude portions of defendant's statement which contained references to a theft of five dollars in that these references were inadmissible because they were highly prejudicial and not relevant to any issue in the case."

Defendant's statement to Pippin, eight typewritten pages in length, contained the following question and answer on the seventh page:

"Q: Mark, during my investigation it had come to my attention that at least another girl's apartment at that location had been entered and $5 was removed from the apartment. Were you responsible for this also?

A: Yes, it was my neighboring apartment."

It is fairly inferable from the context of defendant's statement that the entry referred to in the above excerpt was gained

by the key defendant used to enter complainant's apartment.

■ At trial, Pippin was permitted to read defendant's statement aloud to the jury, in its entirety. Copies of the statement were furnished to the jurors while Pippin read it. Defendant maintains that the trial court erred in allowing the jury to learn that he had admitted entering another apartment and removing $5. Citing *State v. Lasley*, 583 S.W.2d 511, 517[6] (Mo. banc 1979), defendant reminds us that proof of the commission of a separate and distinct crime by an accused is not admissible unless such proof has a legitimate tendency to establish his guilt of the charge for which he is on trial. Evidence of other crimes serves such purpose, and is consequently admissible, where it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime on trial. *State v. Trimble*, 638 S.W.2d 726, 732[4] (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983).

■ In the instant case, the dispositive factual issue was whether defendant was the rapist. Inasmuch as the rapist did not forcibly enter complainant's apartment, the jury could reasonably infer that the rapist gained access by means of a key. Defendant's admission that he had a key by which he had opened an apartment in the complex other than his own was a circumstance the jury could consider in deciding whether he was the rapist.

■ Additionally, defendant was charged not only with raping complainant, but also with committing burglary in the first degree, in that his unauthorized entry into her apartment was for the purpose of raping her. The burglary charge was tried simultaneously with the rape charge. Evidence that defendant had a key that he knew would open apartments other than his own, and that he took such key with him, along with the rope, tape, and Vaseline, when he went to complainant's apartment, was admissible to establish his alleged burglarious intent. Although the jury acquitted defendant of the burglary, that finding could not retroactively render inadmissible the evidence that defendant knew the key would unlock apartments other than his.

■ Defendant's removal of the $5 during his unauthorized entry into the other apartment, however, was not, as we see it, relevant to any issue in the instant case. Therefore, that information should have been kept from the jury. That does not mean, though, that reversal is inevitable.

■ The mere mention of another offense is not per se prejudicial error in the trial of a criminal case. *State v. Lue*, 598 S.W.2d 133, 137[7] (Mo. banc 1980); *State v. Blocton*, 394 S.W.2d 323, 325[2] (Mo. 1965). Whether reversal is required depends upon the circumstances of the case, *State v. Gilmore*, 681 S.W.2d 934, 942[20] (Mo. banc 1984), and hinges upon the extent of the prejudice therefrom. *State v. Martin*, 624 S.W.2d 879, 882 (Mo.App. 1981).

■ We fail to see how defendant's admission that he removed $5 from an apartment he entered using the key he ultimately used to enter complainant's apartment could have tainted the jury's verdict on the rape charge. It was not the taking of the $5 that tended to establish defendant's identity as the rapist, it was his possession of a key that would unlock the doors of the other apartments in the complex. Moreover, the fact that the jury acquitted defendant of the burglary charge, while finding beyond a reasonable doubt that he was the rapist, demonstrates that the jury accepted defendant's explanation in his statement to Pippin that at the time he entered complainant's apartment, his sole purpose was to talk to her, as she reminded him of his 10-year-old daughter.

In these circumstances, defendant's admission that he, on an unrelated occasion, had removed $5 from another apartment,

could not, in our opinion, have prejudiced the jury on the issue whether defendant was the man who raped complainant. Defendant's point 2 is, accordingly, denied.

The final assignment of error briefed by counsel is point 4, which states:

"The trial court erred in failing to instruct the jury on the definition of 'serious physical injury' in that the court was required by MAI–CR 2d 20.02.1 Notes on Use # 3 to give that definitional instruction whether it was requested or not because the phrase 'serious physical injury' was used in Instruction number 7."

The verdict directing instruction on forcible rape was instruction 6, MAI–CR 2d 20.02.1, modified so that the range of punishment would conform to § 566.030.2, RSMo Cum.Supp.1980. Under that instruction, the jury, in order to find defendant guilty, was required to find, among other things, that defendant had sexual intercourse with complainant without her consent by the use of forcible compulsion. The trial court, in instruction 7, defined "forcible compulsion." That definition, MAI–CR 2d 33.01, stated:

"Forcible compulsion
Means either
(a) Physical force that overcomes reasonable resistance, or
(b) A threat, expressed or implied, that places a person in reasonable fear of death, serious physical injury or kidnapping of himself or another person."

Inasmuch as the term "serious physical injury" appeared in the instruction defining forcible compulsion, the term "serious physical injury" should have also been defined in the trial court's instructions. MAI–CR 2d 20.02.1, Notes on Use, para. 3. However, such omission must be reviewed only as plain error, as defendant made no specific objection at trial to the court's failure to define serious physical injury, nor did defendant object specifically to such oversight in his motion for new trial.[2] Rules 28.03 and 29.11(d), Missouri Rules of

Criminal Procedure (15th ed. 1984); *State v. Moland,* 626 S.W.2d 368, 370[1] (Mo. 1982). In order for instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury as to cause manifest injustice. *Moland,* 626 S.W.2d at 370[2]; *State v. Murphy,* 592 S.W.2d 727, 733[17] (Mo. banc 1979).

The contention that failure to define serious physical injury constituted plain error has been rejected in at least four rape cases: *State v. Chaney,* 663 S.W.2d 279 (Mo.App.1983); *State v. Allbritton,* 660 S.W.2d 322 (Mo.App.1983); *State v. Van Doren,* 657 S.W.2d 708 (Mo.App.1983); and *State v. Pearson,* 647 S.W.2d 898 (Mo.App. 1983). In each of those cases, as here, the trial court gave an instruction defining forcible compulsion. In *Chaney,* the accused held a knife against the victim, and she thought he was going to kill her. 663 S.W.2d at 282. In *Allbritton,* the accused, armed with a knife, inflicted cuts on one of the victims and threatened to kill her. 660 S.W.2d at 325–26. In *Van Doren,* the accused placed a knife at the victim's throat and threatened to kill her. 657 S.W.2d at 711. In *Pearson,* the accused, armed with a revolver, threatened to kill the victim unless she submitted.

In the instant case, complainant testified that she "was in fear of my life," and, as noted earlier, the jury was instructed that forcible compulsion means, among other things, a threat, expressed or implied, that places a person in reasonable fear of death or serious physical injury.

Serious physical injury, had it been defined in the instructions, would have been defined as a physical injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. MAI–CR 2d 33.01. Given the evidence that complainant was awakened in the early morn-

**2.** The attorney representing defendant on this appeal is not the attorney who represented defendant at trial.

ing hours in her own apartment by an unknown intruder who taped her eyes, mouth, and arms, forcibly removed her clothing, tied her spread eagle to her bed, and raped her, the jury could have readily found, from complainant's testimony that she was in fear of her life, that there was a threat, expressed or implied, that placed complainant in reasonable fear of death or physical injury creating a substantial risk of death. In such circumstances, as in *Chaney, Allbritton, Van Doren,* and *Pearson,* the likelihood that the jury considered "serious physical injury" to be a less severe injury than defined by MAI–CR 2d 33.01 is so remote that we cannot say manifest injustice resulted from the trial court's failure to define such term. Defendant's point 4 is denied.

Defendant's pro se point asserts that the trial court erred in allowing the prosecutor, during a recess while voir dire was in progress, to amend the rape count by specifying section "566.030.2" instead of section "558.011.1(2)" as the statute fixing the range of punishment. The latter section provides that the authorized term of imprisonment for a class B felony is a term of years not less than five years and not to exceed fifteen years. Section 566.030.2, as amended in 1980, Laws 1980, p. 497, provides (subject to certain exceptions immaterial here) that forcible rape is a felony for which the authorized term of imprisonment is life imprisonment or a term of years not less than five years. Defendant maintains that amending the rape count resulted in an "upgraded and more serious felony."

Contrary to defendant's assertion, no new or different charge resulted from the amendment. The rape count accused defendant of rape by forcible compulsion in violation of § 566.030. The elements of that offense were unchanged by the 1980 amendment to § 566.030. Only the range of punishment was affected by the 1980 amendment. Rule 23.08, Missouri Rules of Criminal Procedure (15th ed. 1984), permits an information to be amended at any time before verdict or finding if no additional or different offense is

charged and if an accused's substantial rights are not thereby prejudiced. *State v. Goree,* 633 S.W.2d 758, 759[1] (Mo.App. 1982). The amendment here charged no additional or different offense, and defendant has demonstrated no prejudice. The point is denied.

Judgment affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.