STATE of Missouri, Respondent,

v.

Derik T. DAVIS, Appellant.

WD 79593

Missouri Court of Appeals, Western District.

Filed: November 28, 2017

S. Kate Webber, Kansas City, MO, for appellant.

Daniel N. McPherson, Jefferson City, MO, for respondent.

Before Division Three: Alok Ahuja, P.J., and Thomas H. Newton and Cynthia L. Martin, JJ.

Alok Ahuja, Judge

Following a jury trial in the Circuit Court of Jackson County, Derik Davis was convicted of first-degree rape, felonious restraint, and first-degree burglary. Davis appeals. He argues that his felonious restraint conviction should be reversed, because there was insufficient evidence that he exposed his victim to "a substantial risk of serious physical injury." § 565.120.1.[1] He also argues that the circuit court plainly erred in failing to declare a mistrial after the prosecution referred to his failure to testify during closing argument. Finally, Davis contends that the circuit court erroneously convicted and sentenced him for first-degree burglary on Count II, when the jury convicted him of the lesser included offense of first-degree trespass.

We affirm Davis' convictions and sentences for first-degree rape and forcible restraint. As the State concedes, however, Davis is correct that the circuit court erroneously entered a conviction and sentence of first-degree burglary, when the jury convicted him of a lesser offense. We accordingly reverse the circuit court's conviction and sentence on Count II, and remand to the circuit court for resentencing and

---

1. Unless otherwise indicated, statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2014 Noncumulative Supplement.

entry of a new judgment with respect to that count.

## Factual Background [2]

Prior to the February 2015 incident underlying this prosecution, the female Victim[3] and Davis had been in a romantic relationship since 2005. The Victim and Davis had lived together on and off until they broke off their relationship in August 2014. The couple have a daughter together, who was six years old at the time of Davis' crimes.

The Victim and Davis continued to have contact after he moved out, when he would come over to visit their daughter. According to the Victim, she last had consensual sexual relations with Davis in November 2014.

Because the Victim had "prior issues" with Davis, she obtained an *ex parte* order of protection against him. That order had not been served on Davis on the date of the underlying incident.

On February 28, 2015, the Victim came home from a family party she had hosted at a nearby restaurant. Her daughter was spending the night with other family members, so the Victim was alone at home. She fell asleep sometime between 8:00 and 9:00 p.m. At about 3:00 a.m. on the morning of March 1, the Victim awoke to use the restroom. After she went back to bed and checked the time on her cell phone, the Victim saw the silhouette of a person in the doorway of her bedroom. She recognized the person as Davis. The Victim texted the word "cupcake" to a female friend; that word was a pre-arranged signal that the friend should call 9-1-1 because the Victim was in trouble with Davis. When the Victim sent the text message,

however, her friend was asleep; she did not see the text message until later that morning.

The Victim asked Davis what he was doing in her house. He said that he needed to talk to her about "taking the restraining order off of him." The Victim stated that she was unwilling to release the order. Davis then jumped on the Victim's bed and began tying her feet together with a shirt. The Victim told Davis that the reason she had obtained the order of protection was "because of this," what he was doing, "things like that."

The Victim kept asking Davis what he was doing, and he told her to shut up. Davis proceeded to "put his weight" on the Victim to hold her down, and grabbed her arms. The Victim tried to pull away, but because Davis was stronger than her, he was able to tie the Victim's arms together with another one of her shirts. The Victim testified that the binding on her arms was tight, and caused her fingers to swell. The Victim asked Davis why he was tying her up, and he repeatedly said that he needed her "to take the restraining order off because he didn't want to get in trouble."

After binding the Victim's arms and legs, Davis pulled her pants off; the Victim unsuccessfully attempted to shift her body to prevent Davis from undressing her. The Victim told Davis that she did not want to be intimate with him. Davis told her that she could "lay here and let [him] do what [he was] going to do, or it can hurt," and asked her which she preferred. The Victim testified that she laid still because she "didn't want him to hurt [her] any more than what [she] felt like he was hurting [her] already. [She] didn't want—[she]

---

**2.** We recite the evidence in the light most favorable to the circuit court's judgment. *State v. Jones,* 479 S.W.3d 100, 105 (Mo. banc 2016).

**3.** Pursuant to § 595.226.1, RSMo 2016, we do not identify the Victim by name.

didn't know what he would do more than what he was already doing." The Victim did not "want to be hit, like he said, it could hurt. [She] didn't know what he meant by that, but [she] didn't want any part of that."

Davis engaged in vaginal intercourse with the Victim. When he was done, he again complained about the order of protection. The Victim repeated that she would not release it. Davis got upset, grabbed a sock, and stuffed it in the Victim's mouth. He then took a belt and wrapped it around her head to hold the sock in place. Davis continued to "rant" about the order of protection and how he would get in trouble, and demanded that the Victim do what he asked her to do. Davis would periodically remove the belt and sock to let the Victim respond. When she would again refuse his request, he would replace the sock and belt.

Davis remained in bed with the Victim. The Victim testified that she could not leave because she was bound, and because Davis was bigger than her and had already used his body weight to pin her down on the bed. The Victim was ultimately able to free her legs, but could not untie her hands, which were bound more tightly. Both Davis and the Victim eventually fell asleep. As they slept, Davis continued to hold the Victim. The Victim's arms were numb by the time she awoke. She decided to tell Davis what he wanted to hear so that he would untie her arms. The Victim had bruises on her wrists when Davis eventually unbound her.

By around 8:00 a.m., the Victim's friend woke up and saw the text message with the signal "cupcake" from earlier in the morning. She called the Victim but got no answer. Davis grabbed the Victim's phone and saw who had called. He told the Victim to call her friend back. Instead of calling her friend, the Victim texted "cup-cake" again. That message was sent at 8:56 a.m. The friend called 9-1-1.

When the police arrived, the Victim ran to the door. She told the police that Davis was inside, that she had an order of protection that needed to be served on him, and that she did not want him in her home. The officers found Davis hiding in a closet in their daughter's bedroom, and arrested him.

The Victim was taken to a hospital and a forensic sexual assault examination was conducted. The Victim had no vaginal or other injuries. The nurse who performed the examination observed redness around the Victim's wrists.

Davis was interrogated by police on the afternoon of March 1, 2015. He claimed that he had been dropped off at the Victim's house in the early morning, and that the Victim let him in. Davis denied any sexual contact with the Victim that day. Police swabbed Davis' penis for purposes of obtaining a DNA sample.

A forensic specialist tested the vaginal and cervical swabs collected during the Victim's examination, as well as her shirts and underwear. No semen or spermatozoa were found on the Victim's clothing or on the swabs. There were no hairs or skin cells found in the pubic combing. Both Davis' and the Victim's DNA was found on the swab taken from Davis' penis.

Davis was charged by indictment with one count of first-degree rape in violation of § 566.030 (Count I), one count of first-degree burglary in violation of § 569.160 (Count II), and one count of felonious restraint in violation of § 565.120 (Count III).

A jury trial was held in February 2015. Davis did not testify or present any evidence in his own defense. During the State's rebuttal closing argument, the

prosecutor made a reference to Davis' failure to testify by stating:

> Ladies and gentlemen, you've seen the witnesses presented here the last few days, 10 witnesses. And one through 10, they told you exactly what happened. February 28th until she woke up at 3:00 a.m. throughout the day of March 1, 2015. *In fact, you didn't have the benefit of seeing the defendant try to explain himself by not saying he did it.* But you know what is a benefit, the lies that he told within a 30 to 45 minute period. Lie, lie, lie. And why was he lying? Because he was guilty and he knew it. And he was hiding in the closet trying to avoid it. But he couldn't hide well enough to avoid being taken into custody by Officer Cowan. Thank goodness for that.

(Emphasis added.)

The jury found Davis guilty of first-degree rape and felonious restraint. On Count II, the jury convicted Davis of first-degree trespass, which was submitted as a lesser-included offense to the charged crime of first-degree burglary. In its oral pronouncement of judgment regarding Count II, the court acknowledged the jury's verdict convicting Davis of first-degree trespass, but referred to the offense as a class C felony, even though under § 569.140 it is a class B misdemeanor. In addition, the court sentenced Davis to one year's incarceration in the county jail on Count II, even though the maximum authorized sentence for a class B misdemeanor at the time was six months. § 558.011.1(6). The court's written judgment varied from its oral pronouncement with respect to Count II: the written judgment states that Davis was convicted on Count II of the original charge of first-degree burglary, a class B felony, rather than of first-degree trespass.

The court's written judgment sentenced Davis to consecutive sentences of fifteen years' imprisonment for rape, one year in jail for first-degree burglary, and five years' imprisonment for felonious restraint.

Davis appeals.

## Analysis

### I.

In his first Point on appeal, Davis argues that the evidence was insufficient to establish his guilt of felonious restraint beyond a reasonable doubt.

When reviewing a challenge to the sufficiency of the evidence, the standard of review is whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. In reviewing the sufficiency of the evidence supporting a criminal conviction, an appellate court does not act as a "super juror" with veto powers but gives great deference to the trier of fact.

*State v. Jones*, 479 S.W.3d 100, 105 (Mo. banc 2016) (citations and internal quotation marks omitted). In conducting our review, we may "not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences." *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (citation omitted). "While [this

Court is] to accept as true all inferences favorable to the State, they must be *logical* inferences that may be reasonably drawn from the evidence." *State v. Gonzalez*, 235 S.W.3d 20, 24-25 (Mo. App. S.D. 2007) (citations and internal quotation marks omitted).

At the time of Davis' offense, felonious restraint was defined in § 565.120.1 as follows: "[a] person commits the crime of felonious restraint if he knowingly restrains another unlawfully and without consent so as to interfere substantially with his liberty and exposes him to a substantial risk of serious physical injury." Thus, "[t]he sole elements of this offense are that the defendant 1) unlawfully restrained the victim and 2) exposed the victim to a substantial risk of serious physical injury." *State v. Christian*, 184 S.W.3d 597, 602 (Mo. App. E.D. 2006) (citations omitted).

Davis does not contest that the evidence was sufficient to prove that he knowingly restrained the Victim, and thereby "interfere[d] substantially with [her] liberty." However, he contends that the State did not present sufficient evidence that his restraint of the Victim "expose[d] [her] to a substantial risk of serious physical injury."

In a prosecution for felonious restraint, "whether the victim actually suffered serious physical injury is irrelevant. The relevant issue is whether the perpetrator exposed her to a substantial risk of serious physical injury." *State v. Mendez*, 487 S.W.3d 66, 70-71 (Mo. App. E.D. 2016) (citations omitted).

> Whether unlawful restraint exposes a victim to the risk of serious physical injury is to be determined from all of the circumstances. Missouri courts have focused on the defendant's behavior for evidence of physical intimidation or vio-

lence which, if repeated or carried further, could have seriously injured the victim or threats of or the propensity to commit violence which, if carried out, could have seriously injured the victim. *State v. Cobbins*, 21 S.W.3d 876, 879 (Mo. App. E.D. 2000) (citations omitted).

Section 565.002(6) defined "serious physical injury" as a "physical injury that [1] creates a substantial risk of death or that causes [2] serious disfigurement or [3] protracted loss or impairment of the function of any part of the body."

"[S]ubstantial risk of death" suggests seriousness in an urgent medical sense: circumstances which give rise to apprehension of life-threatening circumstances. The question is whether the injuries inflicted in the assault, viewed objectively, raise a legitimate concern either that the victim could die or could suffer more than a momentary loss of bodily function.

"[S]erious disfigurement" suggests seriousness in a more aesthetic sense. "Disfigurement" means to deface or mar the appearance or beauty of someone. Injuries suffered by assault victims will differ and therefore whether a victim suffers serious disfigurement is dependent upon the evidence of a particular case. Visibility of scarring, particularly on the face, size of scars, and the presence of additional injuries are all factors in determining disfigurement. "Serious disfigurement" does not require permanent disfigurement.

"[P]rotracted loss or impairment of the function of any part of the body" suggests a relatively minor physical injury—there is no minimum degree of trauma—that bothers a victim for a long time. The concern is not the degree of injury, but the temporal aspect. A "protracted" loss or impairment is something short of permanent, but more than a

short duration. Whether an injury is sufficiently protracted depends on the circumstances of each case.

*State v. Hughes*, 469 S.W.3d 894, 900-01 (Mo. App. E.D. 2015) (citations and internal quotation marks omitted). "[A]n impairment of the function of any part of the body means damage, injury or deterioration and is distinguishable from 'loss' of function." *State v. Christian*, 184 S.W.3d 597, 602 (Mo. App. E.D. 2006) (citation omitted).

The evidence in this case was sufficient to prove that Davis exposed the Victim to a substantial risk of serious physical injury. Davis entered the Victim's home surreptitiously in the middle of the night, while she was asleep. He used his weight and his strength to restrict the Victim's movements, bound her hand and foot, and removed her pants despite her efforts to resist. He then raped her after she told him that she did not want to have sex. Before raping the Victim, Davis told her that she could either let him do what he wanted, or it could hurt. Davis then gagged the Victim with a sock placed in her mouth, and a belt wrapped around her head.

The Victim was actually, and reasonably, in fear that Davis would hurt her more severely if she did not acquiesce in his actions. She had obtained an order of protection, and established a code word with a friend, because of her past interactions with Davis. She also testified that she stopped resisting because she did not want Davis to hit her, or hurt her any more than he already had.

These facts establish "physical intimidation or violence which, if repeated or carried further, could have seriously injured the victim or threats of or the propensity to commit violence which, if carried out, could have seriously injured the victim." *Cobbins*, 21 S.W.3d at 879 (citation omitted).

In arguing that there was insufficient evidence that he exposed the Victim to a substantial risk of serious physical injury, Davis compares this case to the facts in *Cobbins*, and in *State v. Smith*, 902 S.W.2d 313 (Mo. App. E.D. 1995).

In *Smith*, the defendant grabbed the minor victim's wrist and led her into an abandoned garage. 902 S.W.2d at 316. Inside the garage, the defendant forced his drug pipe into the victim's mouth, causing her to choke. *Id.* He then forcibly inserted his penis into her mouth. *Id.* at 314. The Eastern District found that these actions did not "create[ ] a substantial risk of death, nor were they capable of causing serious disfigurement or protracted impairment of any part of Victim's body." *Id.* at 316. The court noted that "the evidence reveals that Defendant never threatened Victim with physical injury," although he issued commands to her. *Id.* The court also emphasized that there was "no evidence [that] Defendant attempted to rape Victim and thereby expose her to the risk of suffering protracted impairment of her vagina or uterus," and that there was no evidence that defendant had a sexually transmitted disease that he could have transmitted to the victim. *Id.*

In *Cobbins*, the defendant offered to give the victim a ride. Once the victim got in the car, defendant "told Victim that he wanted her money," and then "unzipped Victim's purse and took her wallet." 21 S.W.3d at 878. "He removed Victim's glasses and punched out the lenses." *Id.* The Eastern District noted that, as in *Smith*,

[d]efendant never threatened Victim with physical injury. Victim testified that Defendant was not armed and did not even touch her when he removed her wallet from her purse. Although Defen-

dant did pull Victim's glasses off her face, such physical contact is less significant than the defendant's actions in *Smith* and there is no evidence that his actions caused any type of serious disfigurement or protracted impairment of any part of her body. Furthermore, Victim exited the car without a struggle. *Cobbins*, 21 S.W.3d at 879. The court concluded that, "although Defendant's actions were reprehensible, there is insufficient evidence to support Defendant's conviction of felonious restraint." *Id.*

Unlike in *Smith* and *Cobbins*, in this case Davis *did* threaten the Victim with further physical injury, he bound her so tightly that she experienced swelling in her fingers and bruising on her wrists, he used his weight and strength to pin the Victim to her bed, and he raped her. *Smith* and *Cobbins* are not controlling here.

This case is more analogous to *State v. Warren*, 779 S.W.2d 751 (Mo. App. S.D. 1989). In that case, the victim, a young man with a small frame, was abducted off the street by a "bigger and stronger" man, who twisted the victim's arms behind his back, forced the victim into defendant's apartment, and sodomized the victim. *Id.* at 752. The Southern District found sufficient evidence to support a felonious restraint conviction. It noted that the defendant's "apparent strength was enough to cause the victim to be afraid the defendant would kill him," and that "[t]he victim submitted because of the arm twisting and fear." *Id.* at 753. The Court held that the evidence supported a reasonable inference that had the victim resisted, the defendant "would have accomplished his purpose by further violence." *Id.*

Similarly, in *State v. Pippenger*, 708 S.W.2d 256 (Mo. App. S.D. 1986), the Southern District found that "given the evidence that complainant was awakened in the early morning hours in her own apartment by an unknown intruder who taped her eyes, mouth, and arms, forcibly removed her clothing, tied her spread eagle to her bed, and raped her, the jury could have readily found ... that she was in fear of her life, that there was a threat, expressed or implied, that placed complainant in reasonable fear of death or physical injury creating a substantial risk of death." *Id.* at 269-70.

This case involves many of the same circumstances as in *Warren* and *Pippenger*. Davis was bigger than the Victim; he entered her home without her consent in the middle of the night; Davis restrained and gagged the Victim and raped her; Davis threatened the Victim with further physical harm; and she was reasonably in fear that Davis would inflict further violence if she attempted to resist. Because the evidence, taken in the light most favorable to the verdict, was sufficient to show beyond a reasonable doubt that Davis exposed the Victim to a substantial risk of serious physical injury, we affirm his conviction of felonious restraint. Point I is denied.

## II.

■ In his second Point, Davis contends that the trial court plainly erred by failing to declare a mistrial *sua sponte* after the State during its rebuttal closing argument made an improper direct reference to Davis' failure to testify.

■ In its rebuttal argument, the prosecution emphasized that the jury did not have the benefit of any explanation of the events by Davis, other than his pretrial statement:

Ladies and gentlemen, you've seen the witnesses presented here the last few days, 10 witnesses. And one through 10; they told you exactly what happened. February 28th until she woke up at 3:00

a.m. throughout the day of March 1, 2015. *In fact, you didn't have the benefit of seeing the defendant try to explain himself by not saying he did it.* But you know what is a benefit, the lies that he told within a 30 to 45 minute period. Lie, lie, lie. And why was he lying? Because he was guilty and he knew it.

(Emphasis added.)

The Fifth Amendment to the United States Constitution, Article I, section 18 of the Missouri Constitution, section 546.270, RSMo 1994, and Supreme Court Rule 27.05(a) grant criminal defendants the right not to testify and forbid comments by either party concerning the exercise of that right. Accordingly, it is error for counsel to allude, directly or indirectly, to a defendant's failure to testify. Such references violate the defendant's rights not to testify and freedom from self-incrimination by focusing the jury's attention upon a defendant's failure to testify. In considering whether a remark improperly references a defendant's right against self-incrimination, this Court is to consider the comment in context. A direct reference will include words such as "testify," "accused," or "defendant," or their equivalent, whereas an indirect reference is a statement reasonably apt to direct the jury's attention to the defendant's failure to testify, and is made with a calculated intent to magnify the defendant's decision. . . .

*Davis v. State*, 453 S.W.3d 882, 886–87 (Mo. App. E.D. 2015) (citations and other internal quotation marks omitted); *see also State v. Shockley*, 410 S.W.3d 179, 189 (Mo. banc 2013).

 Davis admits that he failed to object to the State's comment when it occurred. The issues is therefore not proper-

ly preserved. "A defendant must object at the time an allegedly improper argument to the jury is made to preserve the error." *State v. Walter*, 479 S.W.3d 118, 122–23 (Mo. banc 2016).

 Davis requests this court to review his claim for plain error under Rule 30.20. This court's "review for plain error of the trial court's failure to *sua sponte* declare a mistrial or strike [an improper] argument is extremely limited." *State v. Crowe*, 128 S.W.3d 596, 601 (Mo. App. W.D. 2004) (citation omitted). "Appellate courts are wary of claims that a trial court erred in failing to declare a mistrial *sua sponte* in a criminal case." *State v. Thompson*, 489 S.W.3d 312, 326 (Mo. App. W.D. 2016) (citation omitted). "Granting a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudice to the defendant cannot be removed any other way." *Id.* (citation omitted).

It is particularly difficult to obtain relief based on an assertion of plain error concerning closing argument because the failure to object during closing argument is more likely a function of trial strategy than of error. Plain error relief seldom is granted on assertions of error relating to closing arguments because absence of an objection and request for relief during closing arguments mean that any intervention by the circuit court would have been uninvited and may have caused increased error. Therefore, to be entitled to relief under plain error review, [defendant] must establish that the improper argument had a decisive effect on the outcome of the trial and amounts to manifest injustice. [Defendant] bears the burden to prove the decisive effect.

*State v. Tisius*, 362 S.W.3d 398, 409 (Mo. banc 2012) (citations and internal quotation marks omitted).

We acknowledge that the prosecution's comment to the jury was improper. The fact that the prosecution made a brief reference to Davis' failure to testify does not necessarily establish plain error, however. As the Missouri Supreme Court explained in another case where the prosecution improperly referred to the defendant's failure to testify in closing argument:

> the absence of an objection is fatal to the defendant's contention. Had objection been made the trial judge could have taken appropriate steps to make correction. The defendant was not necessarily entitled to a mistrial. The judge could consider the state of the evidence and the apparent effect on the jury and might conclude that it would be sufficient to sustain the objection and then caution the jury if requested. Defense counsel did not give him this chance.

*State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992). *Accord State v. Shockley*, 410 S.W.3d 179, 189-90 (Mo. banc 2013); *State v. Walters*, 363 S.W.3d 371, 376 (Mo. App. E.D. 2012); *State v. Dees*, 916 S.W.2d 287, 296 (Mo. App. W.D. 1995).

There was no plain error in the circumstances of this case. The prosecutor's comment was brief, and it was made in the context of emphasizing the strength of the State's evidence and Davis' pretrial statements and actions which attempted to conceal his guilt. The challenged statement was garbled, and may have been confusing to the jury. Davis' counsel questioned the jurors during *voir dire* as to whether they would hold Davis' failure to testify against him, and none responded that they would. Further, the jury was instructed in accordance with MAI-CR3d 308.14 that it should draw no adverse inference from Davis' failure to testify. Finally, the fact that the jury convicted Davis of a lesser offense on Count II provides some indica-

tion that the challenged comment did not severely prejudice Davis in the jury's eyes.

Point II is denied.

## III.

■ In Point III, Davis challenges his conviction for first-degree burglary on Count II of the indictment, and the imposition of a one-year jail sentence for this count. The State concedes that the circuit court's judgment is in error with respect to Count II.

Davis was charged in Count II of the indictment with the class B felony of burglary in the first degree in violation of § 569.160. The jury convicted him on Count II of the lesser-included offense of trespass in the first degree in violation of § 569.140, which is a class B misdemeanor. The circuit court orally accepted the jury's verdict on Count II, but referred to trespass as a class C felony. The court sentenced Davis to one year in jail, with credit for time served. The court's written judgment indicated that Davis had been convicted on Count II of the original charge of burglary in the first degree, a class B felony; the written judgment reflects the one-year sentence orally imposed on Count II.

The State concedes that the written judgment is erroneous both with regard to the offense of which Davis was convicted on Count II, but also with regard to the permissible sentence. The jury convicted Davis of first-degree trespass, a class B misdemeanor, *not* the class B felony of first-degree burglary. Moreover, while a one-year jail sentence may have been an authorized punishment for a class B felony, § 558.011.1(2), the maximum authorized sentence for a class B misdemeanor was a term of incarceration not to exceed six months. § 558.011.1(6).

■ "Being sentenced to a punishment greater than the maximum sentence for an

offense constitutes plain error resulting in manifest injustice." *State v. Taborn*, 412 S.W.3d 466, 474 (Mo. App. W.D. 2013) (quoting *State v. Severe*, 307 S.W.3d 640, 642 (Mo. banc 2010)). We reverse Davis' conviction for first-degree burglary. We remand the case to the trial court to enter a judgment convicting Davis on Count II of the lesser-included offense of first-degree trespass, and resentencing him accordingly. Point III is granted.

## Conclusion

We affirm Davis' convictions and sentences for first-degree rape and forcible restraint. Davis' conviction on Count II for first-degree burglary is reversed, and the case is remanded to the circuit court for entry of a new judgment convicting Davis on Count II of first-degree trespass, and resentencing accordingly.

All concur.